[No. F028186. Fifth Dist. Nov. 7, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID LEE JOINER et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rule 976.1; this opinion is certified for publication with the exception of parts I.B, and IV-VII.

**COUNSEL**

Sharon L. Rhodes, under appointment by the Court of Appeal, for Defendant and Appellant David Lee Joiner.

Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendants and Appellants Robin Sue Beames and Delbert Andrew Beames.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Robert P. Whitlock and Leah Ann Alcazar, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WISEMAN, J.—

INTRODUCTION

In this "chop shop" case we are presented with a tedious and complex set of factual circumstances. Not surprisingly, the facts play an important role in the major issue presented—what type of conduct constitutes a violation of Vehicle Code[1] section 10802, tampering with vehicle identification numbers to misrepresent and prevent identification of motor vehicles and vehicle parts for the purpose of sale or transfer? Unfortunately, this combination of circumstances has resulted in a ponderous and somewhat confusing record that we now recount in excruciating detail.

For the serious reader, we suggest a strong cup of coffee, a pencil and scratch paper. For the casual reader and insomniacs, we suggest a comfortable reclined position to avoid any neck strain that may result from abrupt slumber. For skimmers, we summarize our holdings: (1) the false verification of vehicle identification numbers by a person authorized to verify such numbers to the Department of Motor Vehicles pursuant to section 675.5 constitutes a violation of section 10802; (2) conduct designed to prevent the identification of a vehicle that does not include tampering with the vehicle's identification numbers is not a violation of section 10802; (3) aider and abettor liability for a section 10802 violation does not attach to conduct committed after the tampering with the vehicle identification number has been completed; and (4) a section 10750 offense is not a lesser included offense of section 10802.

PROCEDURAL HISTORY

In an amended information, 25 counts of various offenses were charged against Delbert Andrew Beames (Del), Robin Sue Beames (Robin), David

[1]All statutory references are to the Vehicle Code unless otherwise noted.

Lee Joiner (Joiner), and Sam D'Ambrosio. After a joint jury trial of all defendants, D'Ambrosio was acquitted of all charges against him, and is not a party to this appeal.

The amended information charged the following offenses:

Tampering with a vehicle identification number (VIN) to misrepresent and prevent identification (counts 1, 4, 7, 10, 14, & 24; § 10802; Del—counts 1 & 4; Robin—counts 1, 4, 7, & 10; Joiner—counts 4, 7, 14, & 24.)

Receiving stolen property (counts 2, 5, 6, 8, 11, 16, 21, & 23; Pen. Code, § 496, subd. (a); Del—counts 2, 5, & 8; Robin—counts 2, 5, 6, & 8; Joiner—counts 5, 6, 8, 11, 16, 21, & 23.)

Owning or operating a chop shop (counts 3, 9, 12, 15, 18, 20, & 22; § 10801; Del—counts 3 & 9; Robin—counts 3 & 9; Joiner—counts 9, 12, 15, 18, 20, & 22.)

Unlawful driving or taking of a vehicle (Joiner—counts 13, 17, & 19; § 10851, subd. (a).)

Del, Robin and Joiner were all charged with and acquitted of conspiracy to commit a violation of section 10802 (count 25; Pen. Code, § 182, subd. (a)(1).) Del was found guilty on counts 1 and 2, and not guilty on the remaining counts. Robin was found guilty on counts 1, 4 and 10, and not guilty on the remaining counts. Joiner was found guilty as charged in each count except count 25.

The court granted probation to both Del and Robin, which included 180 days in jail. As to Joiner, probation was denied and he was sentenced to prison for a total unstayed term of six years as follows: the midterm of three years on count 3, and three consecutive one-year terms on counts 9, 12 and 15.

## DISCUSSION

### I. Factual history

#### A. Prosecution's case

Department of Motor Vehicles (DMV) special investigator David Rasmussen testified that an auto dismantler is a person or business that acquires vehicles and ultimately resells them, either in parts or whole. A dismantler must be licensed by the DMV. When dismantlers acquire vehicles, they also

receive registration documents or other paperwork. If the vehicle is acquired from another dismantler, it is accompanied by a bill of sale that carries an acquisition number. Information from the paperwork received with the vehicles, which identifies the vehicle, buyer and seller, is transferred to a DMV form and submitted to the DMV. The DMV then cancels the vehicle's registration, and the vehicle is considered junked or dismantled. At this point the dismantler is authorized to sell the vehicle. The dismantler is required to keep a record book noting where the vehicles were initially obtained.

To reregister a junked vehicle, the new owner must obtain the bill of sale from the dismantler, pay the appropriate fees, and ensure the vehicle passes smog and other required checks. To sell vehicles with the original title documents, the dismantler must also be licensed as a vehicle dealer. If junked vehicles are resold, the dismantler must keep records of the sale and report the sale to the DMV.

All vehicles have a VIN. The VIN is a metal plate that is usually attached to the dashboard on the driver's side of the vehicle. A hidden or secret matching VIN is usually located in six or seven places, such as the frame, engine, or body of the vehicle. Hidden VIN's are used by law enforcement to identify a vehicle when the public VIN has been altered or removed. When a VIN plate is removed from the dash of a junked vehicle and placed on a stolen vehicle, this is known as a VIN "switch." In this procedure, the registration paperwork for the junked vehicle accompanies the stolen vehicle, and the stolen vehicle is represented as the junked vehicle. However, the new public VIN will not match any hidden VIN's on the stolen vehicle.

Rasmussen also explained lien sales documents on sales conducted by storage yards supercede the last title that was issued, which allows the storage yard to repair the vehicle and then sell it. Private persons attempting to register vehicles that have been inoperable for years must pay the registration fees from the prior, unpaid, yearly fees. A dismantler who junks the title can avoid these back fees.

DMV licensing inspector Lilly Henderson testified that vehicle verifiers are persons who inspect VIN's and complete documents attesting to their correctness. Henderson's job included reviewing applications for licenses for vehicle verifiers, and instructing them how to complete their work. Henderson recognized Robin, and vaguely recalled that she had accepted Robin's verifier application. As was her standard practice, Henderson explained to Robin her responsibilities and duties as a verifier. This included the requirement that Robin complete DMV forms by personally inspecting the VIN's on vehicles and recording the information on the proper forms. Additionally,

Robin was instructed to keep additional records on the vehicles for a period of three years, and that she was required to report any irregularities, including scratches or marks, in the VIN plates to the DMV. There were no specific requirements regarding the additional records, and a paper recording the vehicles and numbers verified is sufficient. Aside from the instructions provided by licensing inspectors such as Henderson, no additional training is provided.

Henderson also reviews applications for auto dismantling licenses. This entails the review of the application, acceptance of appropriate fees, and visitation of the location to ensure that all DMV requirements as to the site are satisfied. Henderson recognized Del. She reviewed the application for dismantler with Del, including his job responsibilities. Henderson instructed Del on the proper way to complete forms, keep records, and how soon after records were completed the dismantling process could begin. She also informed him that after the vehicle dismantling forms are completed, the license plate is to be removed from the vehicle and destroyed.

Robin and Del are married, and together owned and managed Budget Auto Wrecking (Budget).

*The Walton/Deniz truck (counts 1 and 2)*

On the morning of December 23, 1994, Debra Walton saw a man, possibly defendant Joiner, jump in her 1990 white Chevy Silverado pickup and drive away. Walton never saw the truck again. She settled with her insurance company for between $13,000 and $14,000.

George Deniz owned a dark blue 1988 Chevy pickup, which he bought when it was two years old. Deniz had owned the pickup for about four years when the engine caught fire and the cab burned. Deniz later sold the pickup for $800 to Al Homan (also known as Homen), Sr. (Homan),[2] an older Portuguese man who indicated he wanted to rebuild it. Deniz signed the pink slip and gave it to Homan. Deniz was shown a bill of sale and another document bearing his name, but testified he had not signed these documents. Several months later, two Portuguese men claiming to be from Budget showed up at Deniz's house with blank DMV forms, stating the forms pertained to his pickup. Deniz refused their request that he sign the forms.

Deniz later twice called Budget at the request of Craig McDonald, an auto theft investigator with the district attorney's office. McDonald monitored both telephone calls and recorded them. In the telephone call, Deniz told Del

---

[2]Homan's son, Alvin Homan, Jr., will be referred to as Alvin for clarity.

that a man had come to Deniz's house wanting him to sign papers on the burned pickup Homan had sold to Del. Del replied that Homan had told him that he had talked with Deniz, and it was okay for Del to sign Deniz's name to the documents. Based on this representation, Del signed Deniz's name to the documents. When Deniz denied having given Homan permission to have Del sign Deniz's name, Del replied that this was a matter between Deniz and Homan. As far as Del was concerned, any problems would be turned over to his attorney to handle. Del also stated that his attorney had subsequently advised him he did not need the documents signed in any event.

At trial, Deniz again denied giving Homan, or anyone else, permission to sign his name to any documents.

Homan testified that his son, Alvin, owned and operated Tulare Auto Wrecking. He bought a badly burned truck from Deniz for which he agreed to pay $800, but actually paid only $500. Deniz signed over the pink slip, but did not sign any other documents. Homan sold the truck to defendant Joiner with the understanding that Joiner would repair the truck, sell it, and split the proceeds with Homan. Homan needed money, so he gave the pink slip for the Deniz vehicle to Del as collateral on a $1,500 loan. Deniz never gave him permission to sign Deniz's name to additional documents, and Homan never told Del or anyone else that they could sign Deniz's name to any documents.

Homan also had another damaged truck that he had purchased from A-One Auto Wrecking. He planned to repair the truck, but eventually sold it to Joiner in early 1995. He had been to Joiner's wrecking yard (Joiner's yard) on several occasions and had observed a truck that he believed belonged to Del. Someone told Homan that Del had given Joiner a cab and trailer to use in repairing the vehicle. He knew that Joiner had never used these parts in the repair of Del's truck because the parts were still at the wrecking yard when the truck was completed. Homan told Del of these facts, and Del said nothing. Joiner once asked Homan if he knew where Joiner might get a wrecked Blazer. Homan told Del he was suspicious that Joiner might take the VIN plates off Del's vehicles. His suspicions were based on his perception that some of the vehicles Joiner was supposed to be repairing were instead being replaced with other vehicles.

Homan admitted having previously pled no contest to a crime connected to the prosecution of defendants. Homan explained his conviction by admitting that he took a VIN plate off a truck when he stored it. He intended to rebuild the truck, but eventually "parted it out" (i.e., sold it for parts). On cross-examination, however, he acknowledged that his conviction was based

on having a "loose" VIN plate from a vehicle that had already been crushed. He had also obtained a smog certificate through Joiner for that vehicle. Homan had thought about using the certificate and VIN plate but could not bring himself to do it. Although he pled no contest to a felony violation, the trial judge reduced the conviction to a misdemeanor. The reduction had not been agreed to in advance, and instead Homan just took his chances. He also denied receiving leniency in exchange for his testimony in this case.

Raymond Robles testified he owned R and R Automotive in Visalia, and was a licensed smog technician. On June 14, 1995, Robles issued a smog certificate for a 1988 Chevy Silverado. The certificate listed the customer as Budget. Robles could not recall who brought the vehicle in, but that person used the moniker "Pancho Villa" in signing the work order. It was Robles's practice to refuse to smog a vehicle if he noticed that its VIN appeared to have been tampered with or altered. Because Del had a credit account with Robles, when vehicles from Budget were brought in for smog checks the standard practice was that Del would call in advance or Robles would call Del to confirm Del's authorization before Robles would smog the vehicle.

Lawrence Motley was a mechanic who managed a shop in Selma called the Pit Stop, which did smog, lamp, and brake inspections. On June 16, 1995, he completed a brake and lamp inspection for Budget of a vehicle bearing the VIN of 1GCDC14K5JZ269229. According to Motley, he would not complete inspections on a vehicle having a VIN plate that appeared to have been tampered with.

According to Jose Montenegro, whose preliminary hearing testimony was read to the jury because he was ruled to be unavailable for trial, he did not know George Deniz. On June 19, 1995, Montenegro purchased a 1988 Chevy pickup from Del for $8,000. He could not register the vehicle because it needed to be weighed. He took the paperwork he had received from Del back to him to resolve the truck weight obstacle and then registered the vehicle. Montenegro denied that the delay in registering the vehicle was due to large back fees. Some time later, Investigator McDonald seized the pickup from Montenegro's home. Montenegro went back to Del, who then returned the $8,000.

Investigator McDonald seized the white truck from Montenegro. The VIN plate appeared to have been tampered with and the federal label was missing. The VIN on the frame of the vehicle matched the VIN plate on the dash, but the VIN on the engine was different. A third VIN that did not match the other two appeared on the glove box. McDonald ordered a VIN history, which showed that the VIN on the dash and frame originated with Deniz, the

VIN on the glove box was from Debra Walton's pickup, and the VIN on the engine was from James Long's stolen pickup. All these parts had been assembled in such a way that a person looking at the vehicle would not be able to tell it was comprised of stolen parts. Only upon examination of the VIN plates could this be discovered.

McDonald agreed that when Budget junked out the original vehicle, a paper trail was created. Had they simply turned over the pink slip to Montenegro, there would have been no paper trail to Budget.

*The Stuhaan Blazer (counts 3, 4, 5, & 25)*

On May 6, 1995, Edward Stuhaan's two-tone brown 1985 Blazer was stolen from his home in Visalia. Weeks later he learned that it had been recovered, and painted a chocolate brown. McDonald went to Sam's Used Cars as part of his investigation. Sam D'Ambrosio gave him a file on a vehicle he had purchased from Joiner and sold to his cousin. The vehicle was brought to the lot upon McDonald's request, and his examination revealed the VIN plate showed signs of tampering. The frame VIN did not appear where it should have, and the federal labels had been removed. The partial VIN on the engine showed the pickup belonged to Stuhaan. Stuhaan identified the vehicle as belonging to him. Budget's records showed they had purchased a blue and white Blazer from Co-Part salvage yard in Fresno and had it in their inventory for about two years. McDonald's investigation revealed it was the VIN from that vehicle that had been placed on the Stuhaan vehicle. It only takes five to 30 minutes to switch VIN plates.

McDonald did not discover any evidence showing Del or Robin had ever been in possession of the Stuhaan vehicle. From the paperwork available, it could not be determined precisely when ownership of the blue and white Blazer passed from Budget. What the paperwork did show was that Budget acquired the vehicle on May 15, 1995, filed a work order pertaining to the vehicle on May 1, 1995, and had it smog-tested on May 12, 1995. On May 12, 1995, Robin verified the VIN on the Blazer containing parts of the Stuhaan vehicle at Joiner's yard. She verified a K-5 model. However, Stuhaan's recovered Blazer had a K-10 body. Nothing in the VIN verification form indicates the color of the vehicle that is being verified.

*The Long/Doran truck (counts 8, 9, & 10)*

Sometime in 1995, James Long had a 1989 GMC pickup stolen from a mall parking lot while he was shopping. At some point he settled with his insurance company.

On December 6, 1994, Bertha Doran's 1993 Chevy pickup, which was white with blue pin striping, was involved in an accident that damaged the frame and the cab. It was towed to Corcoran Auto Wrecking (Corcoran) and a lien sale was later conducted through Ruiz Auto Clearance on February 20, 1995. Doran had trouble settling her claim with her insurance company. Corcoran subsequently sold the vehicle to Budget through Del, for between $1,800 and $2,500, which included an undamaged cab from another pickup. Corcoran delivered the pickup to Del, who directed the tow truck driver to deliver it to Joiner's yard. On April 11, 1995, Scott Saltzman, a property damage appraiser, located and photographed Doran's pickup at Joiner's yard. On April 14, 1995, Joe Wallen, Jr., of Jenkins Automotive in Visalia did a smog check on the vehicle for Joiner.

On either April or May 1, 1995, Ronald Montoya of Dura-Glo Paint Shop did some repair work and painting of the Doran vehicle for Del. There were problems completing the work because some of the parts Del had supplied for the job did not fit the truck; for example, there was a 1994 grill on the pickup. Montoya painted a dent, and fogged the jams under the hood. Montoya had about four telephone conversations with Del about this.

In August 1995, Joiner took a white Chevy pickup to Modern Stereo. On August 2, 1995, McDonald saw it while driving through town. He investigated the VIN and found that it appeared to have been tampered with. The emissions label under the hood showed the vehicle was a 1994, but was registered as a 1993. The VIN on the frame was from James Long's stolen pickup and the engine was from Doran's pickup. The transmission showed signs of having been filed and no VIN was present. The entire pickup was poorly assembled. While not required for registration purposes, Robin had verified the vehicle on June 27, 1995.

*The Terry/Raney vehicle (counts 13, 14, 15, & 16)*

Careen Terry owned a white 1991 Ford Probe with gray interior. The vehicle was in an accident in August 1994, and could no longer be driven. Terry obtained repair estimates of $4,000 and $4,500, which she could not afford to pay. She later entered into an agreement with Joiner for him to repair the vehicle for $2,000. Joiner towed Terry's vehicle to his house in November 1994, and did not complete the repair work until January 1995. Terry complained several times during the process about how long it was taking. Joiner told her he was waiting for parts.

When Terry got her vehicle back, she noticed that some of the plastic parts were not attached, a gauge was not functioning, the car did not steer the

same, and the radio did not work. She recognized the car as hers due to cigarette burns on the upholstery, and because it had the same rims and tires. Because she needed the car, she did not return it for Joiner to fix the problems.

Michael Raney owned a midnight blue 1991 Ford Probe, which was stolen from his jobsite on December 29, 1994, and he never saw it again.

About a year after Terry got her car back from Joiner, McDonald inspected it and found the VIN on the dash board was proper, but the secondary VIN corresponded to the Raney vehicle. Closer inspection revealed the vehicle had been painted, and led McDonald to believe the body of the car was the body of the Raney vehicle, however, the entire interior had been switched.

*The Shouse/Yazzie vehicle (counts 23 & 24)*

Raymond Shouse owned a black Chevy Silverado pickup that was stolen from a store parking lot in February 1995.

Sometime in mid- to late-1995, Duane Yazzie and Susan Archuleta owned a gray 1989 GMC pickup with blue striping and a long bed. Yazzie had an automobile accident in the pickup, and it was subsequently sold to Joiner, who was living with Archuleta's cousin. A couple weeks later, Archuleta saw the pickup at Joiner's house. The pickup had been repaired and was running, but it was a different color, the body looked different, and the bed was shorter.

On March 16, 1995, Wallen of Jenkins Automotive completed a smog inspection on a 1989 GMC pickup with a VIN of 1GTDC14K1KE51611. The mileage on the vehicle was recorded as 79,124. Records recovered from Sam's Used Cars showed that Joiner sold the pickup to Sam's for $6,500, and Sam's later sold it to GNS Auto Sales.

Robert Valdovinos of Xlint Auto Sales, Inc. (Xlint), purchased a 1989 GMC pickup from GNS Auto Sales. On April 21, 1995, Lloyd Lister completed a smog check before Valdovinos purchased the vehicle. The mileage on the vehicle was recorded as 67,184, less than it was a month earlier. Valdovinos testified he did not turn the mileage back.

In May 1995, Daniel Jackson purchased a silver 1989 GMC pickup from Xlint. McDonald recovered this vehicle from Jackson's residence. McDonald found the frame of the pickup was from the Shouse vehicle and the

VIN plate on the dash was from the Yazzie vehicle. The entire truck had been painted a different color.

*Evidence from searches*

McDonald conducted surveillance on Joiner's residence. On July 24, 1995, he served a search warrant. McDonald found stolen vehicles and other evidence that led him to believe Joiner was operating a chop shop. Joiner was also completing legitimate body repair work.

A search was conducted at Budget about the third .week of August. Records were located involving the Long/Doran vehicle and the Stuhaan Blazer, but nothing was found as to the Deniz/Walton vehicle. McDonald was unable to locate the VIN verifier records, which the DMV requires a verifier to keep. It did not appear that a chop shop was being operated at the Budget location, and no stolen property was found there or at the home of Del and Robin.

After the initial search warrant was served at Joiner's residence, Budget closed its business for two days. After a second warrant was served at Joiner's residence in January 1996, Joiner left and went to the home of Del and Robin, where he remained for about an hour and a half.

B. *Defense cases\**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

*II. The substantial evidence analysis*

All three defendants make challenges to the sufficiency of the evidence on certain counts pertaining to them. Joiner contends the evidence with respect to his conviction for unlawfully taking or driving the Raney Ford Probe (count 13) is insufficient. Del contends the evidence with respect to count 1, VIN tampering in violation of section 10802, is insufficient. Robin argues the evidence is insufficient on any of her three convictions, all violations of section 10802. Since Joiner's contention is the most straightforward, both legally and factually, we begin with it.

*Standard of review*

On appeal "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses

---

*See footnote, *ante,* page 946.

substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Substantial evidence includes circumstantial evidence and the reasonable inferences flowing from it. (*In re James D.* (1981) 116 Cal.App.3d 810, 813 [172 Cal.Rptr. 321].)

*Driving or taking a vehicle—Joiner*

■ We agree with Joiner's contention that the evidence fails to support his conviction for a violation of section 10851, subdivision (a), which provides: "(a) Any person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, or any person who is a party or an accessory to or an accomplice in the driving or unauthorized taking or stealing, is guilty of a public offense . . . . "

No evidence was presented to establish that Joiner either drove or took the Raney Ford Probe. Although Raney testified that his vehicle was stolen, he did not see who stole it. The only evidence connecting Joiner to the Raney Ford Probe was that parts from it were found in the Terry Ford Probe after Joiner performed "repairs." While the evidence would establish that Joiner was at some point in possession of stolen property, no evidence shows he was the actual thief of the Raney Ford Probe.

Respondent does not point to any evidence that supports a finding that Joiner either took or drove the vehicle. Instead, respondent relies on language found in *People v. Green* (1995) 34 Cal.App.4th 165 [40 Cal.Rptr.2d 239]—a case bearing no factual similarity to this case. There, the defendant was arrested while driving a stolen vehicle with a broken ignition. The court found substantial evidence to support a conviction for a violation of section 10851, subdivision (a), noting: "Olalde, the owner, did not give appellant permission to drive the car. Accordingly, appellant drove the car without the owner's permission. The jury was entitled to infer that appellant intended to deprive Olalde either permanently or temporarily of possession of his car, based on the totality of the circumstances. [Citation.] Standing alone, evidence of a tampered ignition merely reflects the method by which the vehicle was taken rather than specific intent to deprive the owner of possession of the car. [Citation.] Nonetheless, such evidence when coupled with

other evidence may support a finding of intent to deprive the owner of possession. [Citation.] In addition to operating the car without an ignition key and by means of a screwdriver, which is a common method used by car thieves, appellant was discovered driving the car within four days after it had been stolen. [Citation.]" (*People v. Green, supra,* 34 Cal.App.4th at p. 181, fn. omitted.)

There is no evidence in this case that Joiner drove or was seen driving the Raney Ford Probe, and thus *Green* is distinguishable. In addition, *Green's* interpretation of section 10851, subdivision (a), does not support respondent's position. Respondent focuses on language in *People v. Green, supra,* 34 Cal.App.4th at pages 179-180: "We believe the Legislature intended that the language of section 10851[, subdivision] (a) *relating to driving* is to be applied under circumstances where: (1) the person either obtains lawful possession of the vehicle and thereafter forms the specific intent to deprive the owner of possession; or, (2) obtains the vehicle under circumstances which indicate the perpetrator has knowledge, absent his or her actual taking of the vehicle, that the use or operation of the vehicle is depriving the owner of possession of the vehicle. Had there been evidence appellant knew the vehicle had previously been stolen, it would have supported a finding of the second circumstance." (Italics added.)

Respondent then argues that even if Joiner "did not himself take or drive the Raney vehicle, he knew that it was stolen and his 'use' of the vehicle deprived the lawful owner of possession of the vehicle," supporting a section 10851, subdivision (a) conviction.[3] This argument makes no sense; respondent fails to explain how the "use" of stolen vehicle parts constitutes the "driving" of a vehicle prohibited by section 10851, subdivision (a), as interpreted in *Green*.

The judgment is reversed as to Joiner in count 13. Because no evidence supports the conviction, it is unnecessary to consider Joiner's alternate arguments.

---

[3]Respondent relies on this theory for the first time on appeal. At trial, the prosecutor argued this vehicle theft charge was based not on the Raney vehicle theft, but what he argued was a theft of Careen Terry's vehicle. "There is a charge of auto theft on Careen Terry's, he's charged with that because that vehicle was never found that he towed away from her house." Because Joiner returned to Terry a vehicle stolen from Raney instead of her own vehicle, the prosecutor argued this was auto theft of the Terry vehicle. However, it is unclear at what point the so-called theft was committed since Joiner towed Terry's vehicle with "the consent of the owner thereof . . . ." (§ 10851.) The evidence showed no other taking of that vehicle. Further, the verdict returned by the jury named Raney as the victim in this count.

*VIN tampering[4] to misrepresent or prevent vehicle identification*

Del, in count 1, and Robin, in counts 1, 4, and 10, were convicted of violating section 10802. The parties agree the jury was properly instructed on the elements of this alleged violation, as follows:

"In order to find any defendant guilty of a violation of Vehicle Code Section 10802 each of the following elements must be proved beyond a reasonable doubt:

"1. A defendant knowingly altered, counterfeited, defaced, destroyed, disguised, falsified, forged, obliterated or removed vehicle identification numbers; and

"2. The defendant acted with the specific intent to misrepresent the identity or prevent the identification of motor vehicles or motor vehicle parts, for the purpose of sale, transfer, import or export."

Both Del and Robin contend no evidence was presented to show that they engaged in any of the specific acts prohibited by section 10802.

*Del*

Specifically, Del contends there is no evidence he even touched the VIN plate on the Deniz/Walton vehicle. Del does not contend his conduct or acts did not amount to some type of criminal conduct. Rather, his contention is that he did not violate section 10802. Respondent counters by arguing that section 10802 prohibits "activities designed" to falsify, forge, disguise, etc., VIN's with the intent to misrepresent the identity of the vehicle or prevent identification of the vehicle or its parts. In addition, respondent argues that even if the evidence is insufficient to show Del personally tampered with the VIN, he had prior knowledge that others were doing so for the purpose of preventing the vehicles from being properly identified, and he assisted in preventing the vehicles from being identified. While not exactly a concession, respondent obviously acknowledges there is no evidence that Del personally committed any of the *acts* proscribed in section 10802, or that he aided and abetted the *commission of these acts* by others. In essence, respondent is urging a statutory construction that is broader than the actual language of the statute. Thus, the first question is what conduct constitutes a violation of section 10802.

---

[4]The terms "tampering" and "tampered with" are used here as a shorthand reference to the various specific acts prohibited by section 10802 as a whole, and not as a legal definition of the conduct proscribed in that code section.

*Statutory construction*

■ " 'We begin with the fundamental rule that our primary task in construing a statute is to determine the Legislature's intent. [Citation.]' [Citation.] ' "The court turns first to the words themselves for the answer." [Citations.]' (*Ibid.*) When the statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citation.] The plain language of the statute establishes what was intended by the Legislature. (See *People* v. *Ramirez* (1995) 33 Cal.App.4th 559, 566 [39 Cal.Rptr.2d 374] [it is unnecessary to look beyond the plain words of the statute to determine intent].)" (*People* v. *Fuhrman* (1997) 16 Cal.4th 930, 937 [67 Cal.Rptr.2d 1, 941 P.2d 1189].)

■ Accordingly, our analysis begins with a review of the relevant language set forth in section 10802, which is as follows: "Any person who knowingly alters, counterfeits, defaces, destroys, disguises, falsifies, forges, obliterates, or removes vehicle identification numbers, with the intent to misrepresent the identity or prevent the identification of motor vehicles or motor vehicle parts, for the purpose of sale, transfer, import, or export, is guilty of a public offense . . . ."

Section 10802 prohibits certain activities designed to intentionally misrepresent the identity of a vehicle or prevent identification of a vehicle or its parts. The language of the statute does not permit a construction that *any* activity designed to intentionally misrepresent the identity of a vehicle or prevent identification is sufficient. Had the Legislature intended such a broad application, it would have used language such as "including but not limited to" altering, defacing, etc. vehicle identification numbers with the requisite intent. Further, the construction respondent is espousing does not even require that "the activity" relate to the VIN's. Rather, under respondent's proposed construction, the act of simply painting a vehicle or its parts with the intent to misrepresent the identity or prevent identification would be sufficient to impose liability under section 10802.

For example, respondent argues that Del's act of forging Deniz's signature on transfer documents pertaining to the Deniz/Walton vehicle is sufficient for a violation of section 10802. "From this evidence, the jury could infer that appellant engaged in activity designed to prevent the identity of the vehicle from being discovered, the precise activity section 10802 is designed to prevent." Respondent's proposed construction would effectively remove the requirement that the VIN's be tampered with in any way.

The Legislative Counsel's Digest supports a limited construction. The digest states: "This bill would make it a felony or a misdemeanor, with

prescribed punishment, to knowingly and intentionally own or operate a chop shop, as defined, or to *engage in other specified conduct relative to vehicle identification numbers, as defined,* of motor vehicles or parts with the intent to misrepresent the identity or prevent the identification of the vehicles or parts . . . ." (Legis. Counsel's Dig., Sen. Bill No. 73 (1993-1994 Reg. Sess.) 2 Stats. 1993, Summary Dig., p. 139, italics added.) It is clear from the digest that the law is intended to apply only to the conduct specified in the statute, and the conduct must pertain to VIN's.

A conclusion that the plain language of the statute "should not be stretched beyond recognition does not leave the public without reasonable protection from criminal conduct, for the Legislature has enacted a variety of penal statutes that apply to the criminal activity involved in cases such as . . . the present case." (*People v. Davis* (1998) 18 Cal.4th 712, 723 [76 Cal.Rptr.2d 770, 958 P.2d 1083].) For example, the forging of Deniz's signature on vehicle transfer documents pertaining to the Deniz/Walton vehicle would be a violation of Penal Code section 470. Other activity such as the painting of a vehicle might be covered under section 10801, regarding the operation of a chop shop. Thus, a limited construction to the language of the statute would promote rather than frustrate the clear legislative intent to cover only specified activities involving VIN's.

A review of the record reveals no evidence that Del personally falsified or tampered with the Deniz/Walton VIN as required for a violation of section 10802. The remaining question is whether he aided and abetted another in violating section 10802.

*Aider and abettor liability*

■ The parties agree on the general principles regarding aiding and abetting liability, which were stated in *People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318], as follows: "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ■ The parties, however, disagree on application of these principles to this case. Del argues he cannot be convicted of aiding and abetting a completed crime, since Joiner's crime of altering, disguising or removing the VIN on the Deniz/Walton vehicle was committed before any actions by him. Respondent counters that Del's knowledge of Joiner's "illegal activity at the time it was occurring, coupled with his later assistance in misrepresenting the proper identification of the vehicle, is sufficient to

constitute aiding and abetting." Respondent provides no authority for this position, and the case law does not support it.

■ "It is settled that if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.' " (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039 [31 Cal.Rptr.2d 128, 874 P.2d 903].) However, "it is essential to distinguish the act and intent that constitute 'aiding and abetting' the commission of a crime, from conduct that will incur the lesser liability of an 'accessory' to the crime—defined as conduct by one who, '*after a felony has been committed,* . . . aids a principal in such felony . . . .' " (*Ibid.*) In this respect, not only must the subjective intent to encourage or facilitate the actions of the perpetrator be formed prior to or during the commission of the offense, if there is no participation in the planning, the aider and abettor must take affirmative action at the time the offense is committed. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 83, pp. 98-99.) "To be an abettor the accused must have instigated or advised the commission of the crime or been present for the purpose of assisting in its commission." (*People v. Villa* (1957) 156 Cal.App.2d 128, 133-134 [318 P.2d 828].) "The mere presence of the accused at the scene of the crime does not alone establish that the accused was an abettor." (*Ibid.*)

■ Although respondent does not argue that VIN tampering is an ongoing crime, the only way Del could be convicted as an aider and abettor here would be if we determined VIN tampering is an ongoing crime. Respondent argues that knowledge before the crime coupled with a subsequent act intended to misrepresent the proper identification of the vehicle, is sufficient for aider and abettor liability. This position is not supported by case law. Respondent is actually describing coconspirator liability, not aiding and abetting. Unfortunately for respondent, the jury rejected the conspiracy theory. Thus, the evidence does not support a finding that Del was involved in any planning with Joiner for Joiner to tamper with the VIN on the Deniz/Walton vehicle. Nor does the evidence support a finding that Del instigated, advised, or assisted Joiner in the commission of the VIN tampering offense.

In determining when a crime is ongoing for purposes of aider and abettor liability, *People v. Montoya, supra,* 7 Cal.4th at page 1040, provides guidance. There, the court held that even though the elements of the crime of burglary have been satisfied when the initial entry of a residence is made, for purpose of aider and abettor liability, the crime is ongoing until the final

departure by the perpetrator from the residence. "Under this approach, an offense may have been 'committed,' so as to subject its perpetrator to liability for the completed offense as opposed to an attempt to commit it, but still remain in progress for purposes of determining aider and abettor liability." (*People v. Heath* (1998) 66 Cal.App.4th 697, 707 [78 Cal.Rptr.2d 240].)

Similarly, in *People v. Cooper* (1991) 53 Cal.3d 1158, 1165-1166 [282 Cal.Rptr. 450, 811 P.2d 742], the court held that, for purposes of aiding and abetting, a robbery continues until the stolen property is carried to a place of temporary safety, even though the crime is technically complete when property is taken from the victim's person or presence. In *Cooper*, however, the court noted the crime of burglary, unlike robbery, does not include asportation as one of its elements. Consequently, the court explained that, for purposes of aiding and abetting, liability for burglary would not extend to a person who simply aided a burglar in the asportation of the stolen property after its removal from the burgled structure. (*Id.* at p. 1169, & fn. 13.) "It is legally and logically impossible to both form the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." (*Id.* at p. 1164.)

Here, as the jury was instructed, the crime of VIN tampering under section 10802 is complete when the perpetrator knowingly alters, destroys, etc., a VIN with the specific intent to misrepresent the identity or prevent identification of the vehicle for the purpose of sale, transport, import or export. The actual sale, transfer, import or export need not be completed as long as the VIN is changed for one of those purposes. Since the sale or transfer is not an element of the offense, under the *Cooper/Montoya* rationale, liability for VIN tampering would not extend to a person who simply aided in the sale or transfer of a vehicle whose VIN had been previously changed. This is true regardless of the aider's knowledge that it had been changed to misrepresent or prevent identification of the vehicle. Consequently, the evidence does not support Del's conviction on the theory he aided and abetted Joiner in switching the VIN plates on the Deniz/Walton vehicle simply because he assisted in preventing the vehicle from being identified sometime after Joiner made the switch.[5]

---

[5]A different conclusion might be reached under identical facts with respect to the crime of operating a chop shop in violation of section 10801. Like the crime of manufacturing methamphetamine, operating a chop shop would be an ongoing offense so long as the chop shop is in operation. (See, e.g., *People v. Heath, supra,* 66 Cal.App.4th at p. 708; *People v. Lancellotti* (1993) 19 Cal.App.4th 809, 813-814 [23 Cal.Rptr.2d 640].) Del was charged in two counts of engaging in a chop shop operation with Robin and Joiner, and was acquitted on both counts.

*Robin*

■ Applying the same principles discussed above, Robin also contends the evidence fails to establish she ever personally tampered with a VIN as to any of the three counts she was convicted on. In addition, she argues that to the extent she assisted Joiner in the commission of these offenses, the conduct occurred after the crimes had been completed by Joiner.

Taking the latter contention first, there is insufficient evidence to establish liability on the theory Robin aided and abetted Joiner. Respondent's argument as to Robin is limited to the theory she was a direct perpetrator of the offenses, and respondent does not argue liability on aiding and abetting principles. We conclude Joiner's crimes of violating section 10802 were complete prior to any acts committed by Robin, and thus she could not be convicted of the offenses as an aider and abettor.

The evidence, however, supports Robin's convictions as a direct perpetrator of the crimes. Robin argues there was no evidence presented that she personally ever switched a VIN plate from one vehicle to another. While this is undisputed, the real issue is whether Robin's acts of verifying the VIN's on the vehicles in her role as a VIN verifier could support a finding of falsifying VIN's with the intent to misrepresent the identities of the vehicles verified. Robin argues that her failure to report alteration of VIN plates could have subjected her to disciplinary action by the DMV under section 11305. However, her conduct did not amount to a violation of section 10802. Respondent argues that while Robin may not have been shown to have physically assembled the vehicles in question, she was clearly shown to have verified the vehicles falsely in order to facilitate their transfer. Respondent argues that the evidence shows Robin was responsible for verifying vehicles with obviously tampered VIN plates. Respondent concludes this activity constitutes falsifying VIN's with the intent to misrepresent the identity of the vehicles, as prohibited by section 10802.

Robin argues there is no evidence in the record that she tampered with the VIN plates, and concludes the evidence at most shows that she "was guilty of falsely verifying vehicles, which is not the crime described in Vehicle Code section 10802." Robin's attempt to limit the scope of the statute to physically tampering with VIN plates is rejected.

Section 671, which was added to the Vehicle Code to provide a definition of a "vehicle identification number" in conjunction with section 10802 (see Stats. 1993, ch. 386, § 2, p. 2212), provides: "A 'vehicle identification number' is the motor number, serial number, or other distinguishing number,

letter, mark, character, or datum, or any combination thereof, required or employed by the manufacturer *or the department* for the purpose of uniquely identifying a motor vehicle or motor vehicle part *or for the purpose of registration.*" (Italics added.) Under section 671, it is clear that the acts proscribed in section 10802 with regard to VIN's encompass not only the marks or numbers on the vehicle, but also the documents used by the DMV to uniquely identify a vehicle or for the purpose of registration.

The next question is whether the act of falsely verifying a VIN is equivalent to an act of falsifying a VIN for purposes of section 10802 liability. We conclude that to falsely verify, especially by a licensed VIN verifier,[6] is to falsify a VIN.

The word "falsify" is defined in Webster's New World Dictionary (2d college ed. 1980) at page 504, as "1. to make false; specif., *a*) to give an untrue or misleading account of; misrepresent . . . ." Webster defines "verify" as "1. to prove to be true by demonstration, evidence, or testimony; confirm or substantiate 2. to test or check the accuracy or correctness of, as by investigation, comparison with a standard, or reference to the facts . . . ." (*Id.* at p. 1577.) The word "falsely" is defined in Webster's Third New International Dictionary (1986) at page 819 as "in a false manner: as **a** : WRONGLY, INCORRECTLY . . . **b** : not truthfully : DISHONESTLY . . . **c** : without cause : UNJUSTLY . . . **d** : DECEITFULLY, INSINCERELY . . . **e** : not genuinely : SPECIOUSLY . . . ."

Under these definitions, Robin's acts of falsely verifying VIN's fall within the prohibition against falsifying VIN's. Robin was under a duty to accurately and correctly confirm or substantiate the VIN's she verified. Her verifications were recorded on official DMV documents that were then sent to the DMV for their records. When Robin did so in a false manner, it may be inferred she did so dishonestly and deceitfully. At a minimum, she gave an untrue or misleading account of the VIN's. In addition, the jury necessarily found she did so knowingly and with the intent to misrepresent the identity of the vehicles for the purpose of sale or transfer.

We reject Robin's claim and find substantial evidence supports a finding that her conduct violated section 10802. McDonald testified, as to each of

---

[6]Section 675.5 provides: "A 'vehicle verifier' is a person not expressly excluded by Section 675.6 who inspects, records, documents, and submits to the department, or its authorized representative, such proof of vehicle identification as may be required by the department for the purpose of registering or transferring the ownership of vehicles." Section 675.6, subdivision (a), which excludes four categories of persons from the definition of "vehicle verifier," including peace officers and authorized employees of DMV, does not apply here. To become a vehicle verifier under section 675.5, a person must apply and be issued a permit by the DMV pursuant to section 11300 et seq.

the vehicles involved, that the VIN plates all appeared to have been tampered with. In addition, with respect to the Deniz/Walton vehicle, the federal label was missing. Similarly, with regard to the Stuhaan Blazer, the federal labels had been removed. As to the Long/Doran vehicle, the emissions label under the hood showed the vehicle was a 1994, but was registered as a 1993. Joiner, who was related to the Beameses through Del's prior marriage to his sister, was found guilty of operating a chop shop and of having committed the VIN switches on each of the vehicles. When the initial search warrant was served at Joiner's residence, Budget closed for two days. After a second search warrant was served, Joiner left his residence and went to the Beameses' residence, where he remained for an hour and a half. Based on the foregoing, the jury could reasonably infer that when Robin verified the vehicles, she was aware Joiner had tampered with the VIN plates. In addition, the jury could reasonably infer that she knowingly falsified her verification of the VIN's with the intent to misrepresent them to the DMV so the vehicles could be transferred and registered as documented by her verification. In other words, Joiner switched the VIN plates to disguise the true identity of the vehicles for later transfer, and Robin falsified the documents pertaining to the disguised vehicles to facilitate the documentary transfer and registration. This was all done for the purpose of misrepresenting and hiding the true identity of the vehicles. Consequently, both were properly convicted of violations of section 10802.

In light of this conclusion, the question arises whether the evidence is sufficient to support Del's conviction on a theory of aiding and abetting Robin. This theory was not argued by respondent at trial or on appeal. In any event, we reject it. No substantial evidence supports the theory that Del aided or abetted Robin by act or advice to falsify the verification of the Deniz/Walton vehicle. Assuming Del had knowledge that the VIN on that vehicle had been switched by Joiner, no evidence was presented that he encouraged Robin to falsely verify the VIN to the DMV. While the evidence is sufficient to raise suspicions about possible encouragement or advice, the evidence does not rise above the level of speculation.

### III. Instruction on a lesser included offense

Del and Robin contend the judgment must also be reversed because the court failed to instruct the jury on the lesser included offense of misdemeanor VIN tampering. They contend section 10750, subdivision (a) (10750(a)), is a lesser included offense of section 10802.

#### Standard for lesser included offenses

A lesser included offense is one that is necessarily committed when another, greater offense is committed: the greater offense cannot be committed without necessarily committing the lesser offense. (*People v. Butler*

(1996) 43 Cal.App.4th 1224, 1225 [51 Cal.Rptr.2d 150].) A lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense or the facts actually alleged in the accusatory pleading include all the elements of the lesser offense, so that the greater cannot be committed without committing the lesser. (*People v. Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073]; *People v. Simons* (1996) 42 Cal.App.4th 1100, 1108 [50 Cal.Rptr.2d 351].) An offense is not a necessarily included offense if any of its elements is not an element of the charged offense, so that the purported lesser offense requires proof of some fact in addition to the facts required to establish the charged offense. (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1471 [76 Cal.Rptr.2d 75].)

 The trial court has a sua sponte duty to instruct the jury on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present, and there is substantial evidence that would justify a conviction of a lesser offense. (*People v. Birks, supra*, 19 Cal.4th at p. 118; *People v. Bradford* (1997) 15 Cal.4th 1229, 1344 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Barton* (1995) 12 Cal.4th 186, 194-195 [47 Cal.Rptr.2d 569, 906 P.2d 531].) The obligation to instruct on lesser included offenses exists even when, as a matter of trial tactics, a defendant not only fails to request the instruction but also expressly objects to it being given. (*People v. Birks, supra*, 19 Cal.4th at p. 127; *People v. Barton, supra*, 12 Cal.4th at pp. 196-198; *People v. Breverman* (1998) 19 Cal.4th 142, 154-155 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

The court commits error if it fails to instruct, sua sponte, on all theories of a lesser included offense that find substantial support in the evidence. However, the court is not obliged to instruct on theories that have no evidentiary support. (*People v. Breverman, supra*, 19 Cal.4th at p. 162.) The failure to instruct sua sponte on a lesser included offense in a noncapital case is an error of California law and misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability the error affected the outcome. (*Id.* at p. 165; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

*Analysis*

 We have previously quoted the pertinent language of section 10802. Section 10750(a) provides: "(a) No person shall intentionally deface, destroy, or alter the motor number, other distinguishing number, or identification mark of a vehicle required or employed for registration purposes without written authorization from the department, nor shall any person place or stamp any serial, motor, or other number or mark upon a vehicle, except one assigned thereto by the department."

Del and Robin argue that for purposes of a lesser included offense analysis, the only material difference between sections 10802 and 10750(a), is the former is a specific intent crime and the latter is a general intent crime. They argue it is physically impossible to commit a violation of section 10802 without also violating section 10750(a). As a result, they conclude, section 10750(a) is a necessarily included offense of section 10802. Although Del and Robin argue every specific act prohibited by section 10802 is also prohibited under section 10750(a), the argument fails with respect to at least one prohibited act. As discussed earlier, a violation of section 10802 may occur when the act committed is the falsification of DMV documents or records with the requisite intent.

In this case, the jury could reasonably infer that when Robin verified the vehicles, she was aware Joiner had tampered with the VIN plates. In addition, the jury could reasonably infer that she knowingly falsified her verification of the VIN's with the intent to misrepresent them to the DMV so the vehicles could be transferred and registered as documented by her verification. In other words, Joiner switched the VIN plates to disguise the true identity of the vehicles for later transfer, and Robin falsified the documents pertaining to the disguised vehicles to facilitate the documentary transfer and registration, all with the purpose of misrepresenting and hiding the true identity of the vehicles. Consequently, both were properly convicted of violations of section 10802. However, under the language of section 10750(a), only Joiner also violated that statute. By switching the VIN plates on the vehicles, Joiner "place[d]" a "number" "upon a vehicle" other than "one assigned thereto by the department." In contrast, by falsifying the VIN in the DMV documents, Robin did not also "place or stamp any serial, motor, or other number or mark *upon* a vehicle . . . ." (Italics added.) Nor did Robin "intentionally deface, destroy, or alter the motor number, other distinguishing number, or identification mark of a vehicle," as those terms are commonly understood, when she falsely verified the switched VIN plates on the DMV documents. Under the elements test for lesser included offenses, the criminal conduct that section 10802 prohibits could occur without necessarily violating section 10750(a). (*People v. Lopez* (1998) 19 Cal.4th 282, 290 [79 Cal.Rptr.2d 195, 965 P.2d 713].)

Robin's conduct in particular, disproves the argument that a person cannot physically violate section 10802 without also violating section 10750(a). The specific intent to misrepresent the identity or prevent the identification of motor vehicles for the purpose of transfer is not the only difference in the statutes. In addition, section 10802 casts a larger net by prohibiting a greater number of acts relative to VIN's. These specified additional terms used to define the acts would be rendered superfluous if we were to conclude the

greater number of specified acts are all already encompassed within the terms "deface, destroy, or alter . . . place or stamp," which are contained in section 10750(a). We reject this interpretation and hold that not all acts prohibited in section 10802 are also prohibited in section 10750(a), and therefore conclude the latter is not necessarily included in the former.

IV.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed as to Joiner on counts 5, 8, 11, 13, 16, 21, and 23. The court is directed to strike the convictions on these counts and prepare and forward an amended abstract of judgment to the appropriate authorities. The court shall also correct its minute order dated April 11, 1997, to reflect restitution for Careen Terry in the amount of $4,500. In all other respects the judgment is affirmed.

As to Del and Robin, the judgments are reversed and remanded on all counts, except count 1 with respect to Del, which is reversed for insufficient evidence.

Vartabedian, Acting P. J., and Harris, J., concurred.

A petition for a rehearing was denied December 4, 2000, and respondent's petition for review by the Supreme Court was denied February 28, 2001.

---

*See footnote, *ante*, page 946.