Filed 2/7/14  P. v. Copeland CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058628 |
| v. | (Super.Ct.No. SWF1102416) |
| LYLE PAUL COPELAND, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Albert J. Wojcik, Judge. Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Lyle Paul Copeland, Jr., appeals from a judgment of conviction for first degree burglary.  (Pen. Code, § 459.)  He asserts that the evidence was insufficient to support his conviction.  We disagree, and affirm.

STATEMENT OF FACTS

The People's first witness was Juan Abarca.  At 8:30 in the evening of September 22, 2011, he was unloading groceries from his car in his garage when two white males approached him.  Both were wearing dark clothing with "hoodie" shirts and both were carrying backpacks.  Abarca thought their clothing was unusual for a warm night.  He did not recognize the men, although he had lived in the neighborhood for six years; he described his neighborhood as one in which "[w]e all look out for each other . . . .  If we see something suspicious, one will find each other."

One of the males asked Abarca for a glass of water—with ice.  He refused, and the pair walked slowly away, looking around them as they did so.  As the two approached a nearby unlit residence and disappeared around the side of the house, Abarca (a retired federal police officer) called 911.  On redirect, Abarca testified that houses adjacent or near to the dark house did have lights on, but the men did not approach those houses.

The next witness was Michael King.  He testified that on the day in question he went to bed about 6:00 p.m., as he worked nights.  Before retiring, he locked all windows and the garage, turned out all lights, and set the alarm.  Between 8:30 and 8:45 p.m., his house alarm woke him.  He found a sliding glass door near the kitchen open, as was the kitchen window; the screen had been removed from the latter.  King denied knowing

2

defendant or having given him permission to enter; he also denied knowing Matthew White or giving him permission to enter.[1]  King also testified that his lawn was regularly maintained and that there was a barbecue and patio furnishings near the sliding door, as well as a hose reel.

The third witness was Daniel Girard, whose girlfriend's mother lived on the same street.  On the date and at the time in question, he was driving to that home past Michael King's house.  He noticed two people in the front yard, although the house was dark. After he parked at his destination, he walked back towards that house, but could not see the two people.  After apparently learning that police had been called, he got back in his car to prevent the persons from leaving the neighborhood.  He spotted the pair a street or two away and stopped them until police arrived.  He described the pair as "pretty apologetic and pretty willing to stop and wait."[2]

When law enforcement personnel arrived, Corporal Curtis told defendant that his fingerprints had been found at the King residence.  Defendant admitted being at the house with White and that White had gone into the house, although he denied doing so himself. He stated that he and White had been dropped off by "Jeff," who needed to go to Wal-Mart to buy some sort of charger and was supposed to return for them, but did not. According to defendant, he and White then walked around, and asked Abarca for water

---

[1]  As will appear, Matthew White was defendant's co-perpetrator.

[2]  The two people were defendant and Matthew White.

because they were thirsty. They then decided to try and get water from a house, which they thought was abandoned.[3] When they could not get water from the front faucet, according to defendant, they went around to the back to try a rear faucet.[4] When that was also dry, defendant said that White entered the house. He first told Corporal Curtis that he had left the yard when the alarm went off, but later admitted he was still on the premises. He also admitted that he had knocked on the front door and that he might have touched the window blinds.

Defendant also told Corporal Curtis that he had lent his flashlight to White just before the latter entered the house, although he immediately denied that he knew that White intended to do so. He also said that he reclaimed the flashlight before the entry was made, although he also said that he looked inside the residence and told White that there was nothing inside, and that he *then* handed White the flashlight and the latter went through the window. (Defendant's statements to Corporal Curtis were not consistent.)

The People also called Matthew White, who testified that he met defendant at "Jeff's" house, although his version was that another "Jeff" drove him there and was supposed to return and take White home, but did not. Accordingly, he decided to walk home, and defendant accompanied him. He confirmed that they were thirsty and trying

---

[3] Why they would expect water to be running at an abandoned house is not clear.

[4] It is also unclear why they thought water would be available from one faucet but not the other. At trial, White attempted to explain this by testifying that the faucet, or spigot, was missing from both faucets; arguably the pair might have thought that the rear faucet might be properly equipped.

to find a drink of water.  He testified that he was the one who knocked on the door at the King home, although he also testified that the house appeared abandoned, with grass which was either dead or several inches high.  He denied that there was any hose at the back faucet or any lawn furniture, and in fact "clarified" that both faucets lacked handles and could not be turned.  White testified that defendant was walking away when he, White, decided to open the screen at the kitchen window, and that defendant was urging him to leave when the screen popped off and White entered.  When White saw a dim light and realized the house was occupied, he left through the sliding glass door, triggering the alarm.  The People then elicited White's admission that he had pleaded guilty to burglary, but that there had been no plea agreement with the prosecution.

Next, a recording of White's interview with law enforcement was played for the jury, and the prosecutor noted various inconsistencies with White's current testimony: that it was defendant who found the gate to the King residence so they could enter the backyard; that the faucet *did* have a handle which he twisted; that defendant peered in the kitchen window; that defendant pulled off the screen; and defendant complained that he himself could not fit through the opening.  In another portion of the interview, White also admitted that when he looked in the window of the house, he saw "like, a light from a range," although he gave a confused attempt to explain this, and told the interviewer that "I was still, like, hoping on a hope and a prayer that there was a refrigerator in there with a bottle of water. . . .  And some food, even, too."

5

DISCUSSION

Defendant's position is that the evidence is insufficient to prove that he shared White's intent to enter and commit theft or another felony at the time the latter entered the King residence. He also argues that because White believed that the property was vacant, White could not have had the requisite intent either. We disagree on both points.

The approach of a reviewing court in evaluating a claim of insufficient evidence is well-established. Our task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—which would permit a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.) The same standard applies whether the evidence is direct or circumstantial. (*Ibid.*; *People v. Lopez* (2013) 56 Cal.4th 1028, 1069.) Reasonable inferences may be drawn from the evidence to support the verdict. (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.) Naturally, we resolve conflicts in the evidence in favor of the judgment. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1363.)

It is also not disputed that for liability as an aider and abettor to attach, the defendant must have known that the principal intended the crime, and must have personally intended to aid or encourage the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) That intent must have been formed no later than the actual commission of the offense, although presence at the scene of the crime does not alone

6

establish that the accused abetted the crime. (*People v. Joiner* (2000) 84 Cal.App.4th 946, 967.)

Although defendant argues case law rather extensively, he fails to explain just how or in what particular way the evidence was insufficient to establish his intent to aid White in burglarizing the King residence. We begin first with the objective facts. Two men, wearing dark clothing with the potential to conceal identity, walk through a neighborhood not their own after dark. After approaching one homeowner, they go to the one dark house in the vicinity and, after knocking on the door and receiving no answer, enter the backyard through the gate. Defendant is conveniently equipped with a flashlight, which he gives to his companion so the latter can look through the windows. Defendant admitted that he "might" have touched the blinds through the newly opened window. White indisputably entered the premises and the inference of intent to steal is overwhelming. Although there was contradictory evidence, the jury could have resolved factual disputes against White and defendant with respect to whether the King house appeared abandoned (well kept lawn vs. unkempt or dead grass; the presence or absence of faucets, hoses, and patio furniture).

Thus, there is substantial evidence that a burglary was committed, and defendant's admitted actions prior to White's entry support the conclusion that he was aware that White intended to enter the house, even if we accept as true the claims that the pair were just looking for water. But there is more—White's statement that it was defendant who actually pulled off the window screen and commented that he personally could not fit

7

through the opening. Although this was hearsay, it was a prior inconsistent statement admissible under Penal Code section 1235, and as White testified and was available for cross-examination, his prior statements were admissible for their truth as well as to impeach him. (See *People v. Avila* (2006) 38 Cal.4th 491, 579-580.) White's prior statement even more clearly implicates defendant as a willing participant in the entry of King's home.[5]

Defendant also argues that White operated under a material "mistake of fact" and that he, defendant, therefore could not have intended to assist in a burglary. This theory is based on the premise that White believed the house to be empty, and therefore did not have the intent to commit a residential burglary. But as we have indicated, this is not a necessary or sole conclusion from the evidence, but depends on White's self-exculpatory statements. On the other side, there was substantial evidence—the owner's testimony—that the house was visibly occupied, leading to the inference that both White and defendant were aware of this and that White flatly lied when he denied that there were water faucets, a barbecue, or lawn furniture near the kitchen area, and when he described the grass as unkempt. In White's original statement to police, he admitted seeing a "range light" and that he hoped to find a refrigerator inside

---

[5] Defendant argues that these statements were "self-serving" and "inherently suspect," implying that no reasonable juror could have believed them. On the contrary; during his interview with police, defendant freely admitted entering the residence and his intent to take water; he also admitted that if the alarm had not gone off, he probably would have taken food from the refrigerator. Thus, his statements about defendant in no way minimized his own responsibility or represented an obvious attempt to shift blame.

8

the kitchen. This adds to the substantiality of the evidence that although White may have believed that no one was home, he was aware that the residence was occupied. (See *People v. Meredith* (2009) 174 Cal.App.4th 1257, 1266, and cases cited, for the rule that a structure is "inhabited" for the purposes of establishing the degree of a burglary even if the person who lives there is temporarily absent.)

Accordingly, the judgment was supported by substantial evidence.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST _____
Acting P. J.

We concur:


McKINSTER _____
J.


CODRINGTON _____
J.