Filed 2/20/24; certified for publication 3/5/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROSS RICHARD KILLIAN,<br><br>    Defendant and Appellant. | H050320, H050557<br>(Monterey County<br>Super. Ct. Nos. 22CR003439,<br>22CR006162) |

This appeal requires us to examine the elements of the crime of knowingly tampering with vehicle identification numbers (VIN's) to misrepresent or prevent identification of motor vehicles or motor vehicle parts for the purpose of sale, transfer, import, or export ("VIN tampering"[1]; Veh. Code, § 10802[2]). We conclude that the crime described by section 10802 includes tampering with a single VIN while harboring the requisite mental states. We further decide that section 10802's mental state of "for the purpose of sale [or] transfer" extends to the objective of facilitating a conveyance of the

---

[1] We use "tampering" and "tamper" as shorthand references to the acts prohibited by Vehicle Code section 10802 as a whole. (See *People v. Joiner* (2000) 84 Cal.App.4th 946, 964, fn. 4 (*Joiner*).)

[2] Unspecified statutory references are to the Vehicle Code.

motor vehicle regardless of whether the defendant intended to act as a seller, buyer, transferor, or transferee in the conveyance.

A jury convicted defendant Ross Richard Killian of receiving a stolen motor vehicle (Pen. Code, § 496d, subd. (a)) and VIN tampering (§ 10802). In a bifurcated court trial, the trial court found true that Killian had suffered a prior strike conviction for assault with a firearm (prior strike) (Pen. Code, §§ 245, subd. (a)(2), 1170.12, subd. (c)(1)).[3] The trial court sentenced Killian to an aggregate sentence of four years imprisonment.

In this court, Killian asserts four claims of error. He contends there is insufficient evidence to support his conviction for VIN tampering and, alternatively, the trial court misinstructed the jury on an element of that offense. Additionally, Killian raises three claims concerning his sentence: The prison term imposed for his VIN tampering conviction must be stayed under Penal Code section 654; there is insufficient evidence to prove he had suffered a prior strike conviction for assault with a deadly weapon under Penal Code section 245, former subdivision (a)(1); and the trial court erred by failing to apply certain amendments effected by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) (Senate Bill 81) when it refused to strike the prior strike under Penal Code section 1385.

For the reasons explained below, we affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

A.  *Procedural History*

Killian has appealed from the judgment in two cases and from a restitution order.

---

[3] Killian's notice of appeal includes a second no contest plea case, discussed *post*, but on appeal he makes no legal claims of error with respect to that conviction. Killian also filed a second notice of appeal with respect to a postjudgment restitution order. He similarly makes no legal claims of error with respect to that order. We granted Killian's motion to consider the appeals together for the purposes of briefing, oral argument, and disposition.

In July 2022, in docket No. 22CR003439 (hereafter "jury trial case"), the Monterey County District Attorney filed a second amended information (information) charging Killian with operating a chop shop (§ 10801; count 1), receiving a stolen motor vehicle (Pen. Code, § 496d, subd. (a); count 2), tampering with VIN's (§ 10802; count 3), and being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1); count 4).[4] The information also included a prior strike conviction allegation (Pen. Code, § 1170.12, subd. (c)(1)), asserting that on March 7, 1996, in Monterey County Superior Court docket No. SC951263, Killian had been convicted of two offenses: assault with a deadly weapon or by means of force likely to produce great bodily injury (Pen. Code, § 245, former subd. (a)(1)) and assault with a firearm (Pen. Code, § 245, subd. (a)(2)).

The jury found Killian guilty of receiving a stolen motor vehicle (count 2) and tampering with VIN's (count 3) but acquitted him of the other charges. In a bifurcated proceeding, the trial court found Killian had suffered a prior strike conviction for one of the alleged prior offenses, namely assault with a firearm (Pen. Code, § 245, subd. (a)(2)).

In July 2022, in docket No. 22CR006162 (hereafter "plea case"), the district attorney filed a complaint charging Killian with one count of bringing a controlled substance (methamphetamine) into jail (Pen. Code, § 4573, subd. (a); count 1). The complaint also included a prior strike conviction allegation (Pen. Code, § 1170.12, subd. (c)(1)) based on Killian's March 7, 1996 conviction for assault with a firearm (Pen. Code, § 245, subd. (a)(2)).

On the date set for a preliminary hearing in the plea case, the district attorney orally amended the complaint to include a charge of possession of a controlled substance in jail (Pen. Code, § 4573.6, subd. (a); count 2). Killian entered a "plea to the court," in

---

[4] The second amended information is not included in the record on appeal. However, according to the trial court, that information simply "correct[ed] the date on the prior." Given the minor correction described by the trial court, we state the charges and sentencing allegation based on the first amended information, which does appear in the appellate record.

3

which he pleaded no contest to possession of a controlled substance in jail (count 2) and admitted the prior strike conviction allegation. Count 1 was designated for dismissal at sentencing.

In August 2022, the trial court sentenced Killian on both cases. The court granted Killian's motion to strike the prior strike in the plea case (Pen. Code, § 1385; *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*)) but denied that motion in the jury trial case.

In the jury trial case, the trial court sentenced Killian to a lower term of one year, four months for receiving a stolen motor vehicle (count 2) plus eight months (one-third the middle term) consecutive to count 2 for tampering with VIN's (count 3). Both terms were doubled due to Killian's prior strike, for a total prison term of four years. In the plea case, the court imposed a two-year lower term concurrent with the sentence in the jury trial case.

On November 10, 2022, in the jury trial case, the trial court ordered Killian to pay victim restitution to the owner of the stolen vehicle, in the amount of $2,451 plus interest.

Killian appealed from the judgment in the jury trial case. In the plea case, he appealed "based on the sentence or other matters occurring after the plea that do not affect the validity of the plea" (collectively with the appeal in the jury trial case, No. H050320). In addition, Killian appealed from the victim restitution order (No. H050557).

B. *Evidence Presented at Trial*

1. Prosecution Evidence

On the afternoon of February 4, 2022, Michael B. parked his white 2010 Ford F-150 pickup truck in front of his house in Salinas.[5] He left his keys inside the truck while

---

[5] Unless otherwise indicated, all dates were in 2022. In addition, we refer to the victim, Michael B., by his first name and last initial to protect his privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4).)

bringing some items into the house. When he exited his house a few minutes later, his truck was gone. His cellphone, some blankets, and "some food and stuff" that he had just bought were inside the truck. He estimated that his truck was worth about $16,500.

Michael B. later received information regarding the whereabouts of his truck. In the early afternoon of February 7, he spotted the truck at a property on Briarcliff Terrace in Monterey County. His truck was parked next to a nearly identical white 2012 Ford F-150 pickup truck. He called the police.

California Highway Patrol (CHP) Officer Anthony Rivera responded to the scene and spoke with Michael B. CHP Officer Charles Rodriguez arrived soon after and saw the two trucks, other vehicles, equipment, and parts on the property.[6] Along with sheriff's detectives, Officers Rivera and Rodriguez surveilled the property and vehicles. Officer Rodriguez saw Killian move items from one truck to the other, remove a large toolbox from one truck and place it on the ground, and go into and out of a garage. Officer Rivera applied for and obtained a search warrant.

About 4:00 p.m. that same day, Officer Rivera and other officers executed the search warrant. Killian had left the property.

The license plates that had been on Michael B.'s 2010 F-150 when it was stolen were missing. Officer Rivera checked the public VIN plate on the dashboard of Michael B.'s truck and saw that "it didn't look like a normal public VIN would look." The VIN plate was missing a rivet and there was a small black screw to the left of where the rivet should have been. The number on the abnormal VIN plate did not match the 2010 F-150's true VIN, which was on a VIN plate underneath the abnormal one. The passenger compartment of the truck was "filled with numerous things" that did not belong to

---

[6] Officer Rodriguez testified as an expert in chop shop and auto theft investigations within Monterey County.

Michael B., including clothes, mail addressed to Killian, a dog, tools, a loaded shotgun, and a cellphone. Officer Rivera believed that "somebody had been living in" the truck.

As for the other truck parked nearby (the 2012 F-150), a tarp covered its front end. The engine looked dismantled. Officer Rivera confirmed that Killian owned the 2012 F-150. Killian had purchased the truck for $10,300 from a company in Pennsylvania in May 2021. At the time Killian bought the truck, it was in good condition. According to the seller, Killian was excited to purchase the truck and said he was "looking for transportation to get back to California."

A search of the cellphone discovered in Michael B.'s truck revealed that the phone belonged to Killian. A text message sent from that phone to a person named Mike about 1:04 p.m. on February 7 read: " 'Are you up bro? I need to get out of here before the cops roll up [on] me.' " Another text message sent about one minute later read: " 'Hey, buddy. Sorry to hound you. Burr [*sic*]. The thought of going back to jail is making me sick to my stomach.' " Officer Rivera opined that these text messages were significant because, at the time Killian sent them, the police had been surveilling the property, Killian did not have an outstanding warrant, and he was not on probation. In addition, Killian's phone contained "a news article clip" that included the phrase " '[c]loning vehicles, a trending crime' " and a picture of a VIN. Officer Rivera explained that " 'cloning' " can involve stealing a vehicle and disguising its true identity with that of another similar, "clean" (i.e., legally possessed) but inoperable vehicle.

On cross-examination, Officer Rivera agreed that people might switch a VIN for various reasons, including but not limited to selling a stolen vehicle. Officer Rivera testified further that there was nothing on Killian's phone indicating that Killian intended to sell Michael B.'s stolen 2010 F-150. Likewise, there were no messages on Killian's phone about him wanting to transfer, export, or import the 2010 F-150.

6

2.  Defense Evidence

Phillip Greene Sr. (Greene) is the father of Killian's ex-wife, Kelly.  Greene testified that he owns and lives at the Briarcliff Terrace property with his wife, his adult children (Kelly and Phillip Jr.), and his grandchildren.  Greene said that Killian had been temporarily residing on the property for several months and Greene had told Killian that he needed to find somewhere else to live.  Greene believed that Killian's "truck blew up" and Killian "was going to . . . New Jersey or Pennsylvania or somewhere" but did not have the money to fix his truck.  Greene said that Killian had been working on his truck "[a] lot," using Greene's tools.

Killian testified in his own defense.  He purchased his 2012 F-150 pickup truck (in a documented transaction) to drive back to California.  Soon after he returned to California, the truck's engine failed, and Kelly helped tow the truck to her father's property.  About two weeks later, Killian bought an engine and installed it in his truck, but that engine failed as well.  Killian tried but failed to repair the second engine.  During this time, Killian was living in a trailer on Greene's property.  Killian was not planning to stay at the property permanently because the living conditions were "not very good" and he "was actually on [his] way to Kentucky."  Killian's sister lives in Kentucky and had invited him to stay there.

Around this time, a man named Chris Marker called Killian and said that he had a truck for sale for $1,500.  Killian gave Marker $700 (all the money that Killian had on hand) for the truck, and Marker said that Killian "could pay him the rest later."  Killian testified that he got a "pretty great deal" on the 2010 F-150 and planned to use it "[t]o get out of there.  [He] needed to leave the property."

Killian possessed the 2010 F-150 for 24 hours before the police seized it on February 7.  During that 24-hour period, he changed the truck's oil and loaded his belongings into the truck because he was "in a hurry to get out of there."  He did not see a

7

gun in the truck, did not own a gun, and could not own a gun because he had suffered a felony conviction at age 19.

Regarding the VIN on the 2010 F-150, Killian testified: "I put mine on it" and "I took it off the [truck] I owned to put it on the new one." Killian explained further, "I was trying to save money on registration and stuff. So I used my VIN to try to beat that. So that's what I guess I'm guilty for."

Killian testified that he did not intend to sell or transfer the 2010 F-150, and he did not know it was stolen or whether it was registered. On the day the police executed the warrant, he had left the property to visit a neighbor.

On cross-examination, Killian testified that Marker knew Killian's 2012 F-150 "was [blown] up" when Killian purchased the 2010 F-150 from Marker. Killian cut a hole in the windshield of his broken-down truck to access its VIN plate and Phillip Jr. assisted Killian by drilling out the rivets and placing the VIN plate inside the 2010 F-150. Within about six hours after Killian had purchased the 2010 F-150, he showed the truck to "Phillip" and told him about the purchase.[7] Phillip said Marker is a car thief and asked Killian, " 'Is it hot?' " Killian replied, " 'I don't think so.' "

Killian admitted that he had two prior felony convictions in the 1990's, a 2016 misdemeanor conviction for possession of stolen property, a 2016 felony conviction for possession of stolen property, and a 2017 conviction for giving false information to a police officer.

3. Prosecution Rebuttal

Officer Rivera testified about a recorded interview of Killian conducted after his arrest on April 11. In that interview, Killian said that "Chris" had "charged [him] $1,500.00 for the truck," but Killian offered "[$]800 and ended up paying [$]750" and

---

[7] The record is unclear on whether this "Phillip" is Phillip Greene Sr. or Phillip Greene Jr.

8

"still owe[d] him 50 bucks." Killian also said that Chris had given him "a little bill of sale," which Killian last saw inside the truck. Officer Rivera testified that no bill of sale was found in the truck.

## II. DISCUSSION

Killian raises four claims on appeal, all relating to the conviction and sentence in the jury trial case. He contends: (1) there is insufficient evidence for his conviction under section 10802 (count 3) and, alternatively, the trial court misinstructed the jury on that offense; (2) the prison term imposed on count 3 must be stayed under Penal Code section 654; (3) there is insufficient evidence to prove he had suffered a separate prior strike conviction for assault with a deadly weapon under Penal Code section 245, former subdivision (a)(1); and (4) the trial court erred by failing to apply certain amendments effected by Senate Bill 81 to Penal Code section 1385 when it refused to strike the prior strike in the jury trial case.

We address Killian's claims in turn.

A. *Sufficiency of Evidence and Instructions Under Section 10802*

1. Further Procedural Background

Section 10802 provides: "Any person who knowingly alters, counterfeits, defaces, destroys, disguises, falsifies, forges, obliterates, or removes vehicle identification numbers, with the intent to misrepresent the identity or prevent the identification of motor vehicles or motor vehicle parts, for the purpose of sale, transfer, import, or export, is guilty of a public offense and, upon conviction, shall be punished by imprisonment pursuant to subdivision (h) of [s]ection 1170 of the Penal Code for 16 months, or two or three years, or by a fine of not more than twenty-five thousand dollars ($25,000), or by both the fine and imprisonment, or by up to one year in the county jail, or by a fine of not more than one thousand dollars ($1,000), or by both the fine and imprisonment."

Count 3 of the information mirrored the language of section 10802.

9

At trial, the court noted that there is no CALCRIM pattern jury instruction for section 10802. The parties jointly developed a jury instruction for count 3 and agreed to the wording of the instruction.

The agreed-upon jury instruction read as follows: "The defendant is charged in [count 3] with VIN [a]lteration in violation of Vehicle Code section 10802. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. A defendant knowingly altered, counterfeited, defaced, destroyed, disguised, falsified, forged, obliterated, or removed vehicle identification numbers; and [¶] 2. The defendant acted with specific intent to misrepresent the identity or prevent the identification of motor vehicles or motor vehicle parts, for the purpose of *sale or transfer*.[8] [¶] Crimes of vehicle identification number (VIN) tampering is complete [*sic*] when the person knowingly alters or destroys a VIN with specific intent to misrepresent the identity or prevent identification of the vehicle for the purpose of sale or transport,[9] the actual sale

---

[8] Although section 10802 includes the additional purposes of "import" and "export," and those purposes were included in count 3 of the information, neither import nor export was included in the final jury instruction. Because the import and export purposes were not submitted to the jury for consideration and the Attorney General makes no specific argument that the trial evidence proved either of those purposes, we do not consider them further.

[9] Neither party addresses in their briefing the discrepancy between the phrase "for the purpose of sale or *transfer*" (italics added) stated in element No. 2 of the jury instruction and the subsequent phrase "for the purpose of sale or *transport*" (italics added) stated in the explanation in the jury instruction regarding completion of the offense.

Section 10802 itself does not use the word "transport." (See § 10802.) It appears the language referencing "transport" was taken from *Joiner*, *supra*, 84 Cal.App.4th at page 968, the only published decision interpreting section 10802. *Joiner* itself neither explains the use of the word "transport" (instead of "transfer") nor uses the word "transport" in any other portion of the opinion. Because the parties make no specific argument about this discrepancy in the jury instruction, we do not address whether inclusion of the word "transport" in the jury instruction affects Killian's claim of error under section 10802.

10

or transport need not be completed as long as the VIN is changed for those purposes." (Italics added.)

In closing argument, the prosecutor asserted that there was "no question" about element No. 1 in the jury instruction, because Killian admitted on the witness stand that he intentionally took the VIN off his pickup truck and put it on Michael B.'s stolen truck. Regarding the second element, the prosecutor argued that Killian "acted with the intent to . . . misrepresent the identity or prevent the identification of the motor vehicle or parts for the purposes of sale or transfer." The prosecutor further asserted that Killian "had the intent to take his VIN off, [and] put it on [Michael B.]'s vehicle. And he did it with intent to transfer it. He wanted to make that his vehicle. He wanted to disguise it and hide the VIN so that way if . . . he happened to come by law enforcement, it's going to pass" as his broken-down truck.

Killian's defense counsel argued that the testimony showed "Phillip [Jr.] put the VIN on top of the new VIN. Not [Killian]." Counsel argued further: "The People want you to believe that [Killian] purchased this vehicle to alter it and transfer it to himself. [¶] But the testimony was that he already had the vehicle. He already bought the vehicle from Chris. He already owned this vehicle. [He] didn't purchase the vehicle and then transfer it to himself with altering the VIN. He already owned the vehicle." Counsel also asserted that "there was no indication or evidence presented by the prosecutor that [Killian] was intending on selling [the truck] to someone else or transferring it to someone else."

In rebuttal, the prosecutor reiterated that Killian knew the 2010 F-150 was stolen and wanted to "disguise [the] truck, pass it as his own. He wanted to transfer it and he wanted it to become his. And then he wanted to go to Kentucky. [¶] . . . He admitted he wanted to hide the identity of the truck. He wanted to avoid detection. And that's what he did. By taking that VIN plate off his car and putting it on to the public VIN on [Michael B.]'s truck."

11

During deliberation, the jury asked the following question: "Under Vehicle Code [section] 10802 (VIN alteration) does transfer include transfer of ownership of the vehicle to himself?" When the trial court and the parties discussed the jury's question, the court noted that "the term 'transfer' is not defined" in the Vehicle Code." Defense counsel objected to a proposal to respond " 'yes' " to the jury's question. The court proposed two alternatives, and the parties agreed to the following answer: "Please refer to Instructions 200 and [section] 10802.[10] [¶] Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings. [¶] Pay careful attention to all jury instructions and consider them together."

### 2. Arguments on Appeal

In his opening brief, Killian contends that "a person cannot 'transfer' a vehicle to himself" and, to violate section 10802, a person must tamper with a VIN for the purpose of "selling, transferring, importing or exporting the vehicle so modified to another person." In turn, Killian asserts there is insufficient evidence that he sought to sell or transfer the stolen 2010 F-150 (stolen truck) to another person. Alternatively, Killian contends that the trial court prejudicially erred by instructing the jury and responding to the jury's question in a manner that "failed to explain that the 'purpose of sale or transfer' required a 'transfer' be to another person, and not to the defendant himself."

The Attorney General responds that although "[Killian] accurately identifies the mens rea element as requiring a defendant to modify the VIN for the purpose of a sale, transfer, import, or export," "there was substantial evidence that [Killian] modified the VIN on his [truck] to transfer the stolen truck's registration from an unknown owner to himself, or to complete a sale from Chris Marker to himself." The Attorney General further asserts that Killian forfeited his instructional error claim, the trial court did not err

---

**10** "Instruction[] 200" refers to CALCRIM No. 200, which states the duties of the judge and jury.

12

in its instructions to the jury, and, regardless, the alleged instructional error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

Upon review of the parties' briefing, we requested supplemental briefs regarding whether, under section 10802, the prosecution was required to prove that "(1) Killian possessed the intent to misrepresent the identity or prevent the identification of his 2012 Ford F-150 pickup truck and (2) Killian acted 'for the purpose of sale, transfer . . .' of his 2012 Ford F-150 pickup truck." In addition, we asked whether there is sufficient evidence to support these two elements with respect to Killian's 2012 F-150.

In his supplemental brief, Killian contends that section 10802 prohibits VIN tampering "involving acts *and* wrongful criminal intent regarding the 'sale, transfer, import or export' of *multiple* motor vehicles." He argues that based on the language of the statute and its legislative history, section 10802 required proof that he "had the intent to 'misrepresent the identity or prevent the identification' of *both* the stolen 2010 F-150 and [his] broken-down 2012 Ford F-150 pickup truck, and further required proof that he acted 'for the purpose of sale, transfer [etc.] . . .' of both pickup trucks." He further asserts that "there is absolutely no evidence that he had any intent to either misrepresent the identity of any other vehicle [beside the stolen truck], or a purpose of selling or transferring . . . [his] broken-down 2012 F-150 pickup truck."

The Attorney General disputes Killian's contention that the prosecution had to prove the elements of section 10802 with respect to both trucks. The Attorney General contends that "section 10802's use of the plural form of 'numbers,' 'vehicles,' and 'parts' does not mean that, in order to establish a violation of this section, the prosecutor must prove the defendant committed these acts relative to more than one VIN, vehicle, or part." The Attorney General asserts that "section 14, and a common statutory construction principle, provide that a statute's use of the singular tense includes the plural, and the use of the plural tense includes the singular. The fact that section 10802 is phrased in the plural, without more, is not dispositive." The Attorney General

acknowledges there is no evidence demonstrating that Killian acted with the purpose of selling or transferring his 2012 F-150.

### 3. Legal Principles

"In construing a statute, our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. [Citation.] We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed 'in the context of the statute as a whole and the overall statutory scheme, and we give "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' [Citation.] In other words, ' "we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" ' [Citation.] If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.) "If a penal statute is still reasonably susceptible to multiple constructions, then we ordinarily adopt the ' "construction which is more favorable to the offender." ' " (*People v. Rizo* (2000) 22 Cal.4th 681, 685–686.)

"When reviewing the evidence for legal sufficiency, our task is limited. We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime.' [Citation.] We make this determination using the statutory language [citation], because 'the plain language of our statute must control as to the acts which constitute the crime.' [Citations.] We apply de novo review to the meaning of statutory language." (*People v. Coulthard* (2023) 90 Cal.App.5th 743, 753 (*Coulthard*).)

14

"We further determine whether the entire record ' "contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.] 'In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' [Citation.] 'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.] ' "We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*Coulthard*, *supra*, 90 Cal.App.5th at pp. 753–754.)

Regarding jury instructions, "[t]he trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) Furthermore, " '[t]he court has a primary duty to help the jury understand the legal principles it is asked to apply.' [Citation.] During jury deliberations 'when the jury "desire[s] to be informed on any point of law arising in the case . . . the information required must be given." ' [Citations.] 'However, "[w]here the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." ' [Citation.] [Citation.] Although the trial court need not always elaborate on the standard instructions, the trial court nevertheless has 'a " 'mandatory' duty to clear up any instructional confusion expressed by the jury." [Citation.]' [Citations.] This means that a trial court's response to a jury question can be erroneous even if it does not technically misstate the law." (*People v. Fleming* (2018) 27 Cal.App.5th 754, 766 (*Fleming*); see also *People v. Brooks* (2017) 3 Cal.5th 1, 97; *People v. Doane* (2021) 66 Cal.App.5th 965, 980.)

15

We review jury instructions de novo to determine whether they completely and correctly state the law. (See *People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574; *People v. Franklin* (2018) 21 Cal.App.5th 881, 887.) " 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights. In making this determination we consider the specific language under challenge and, if necessary, the instructions as a whole. [Citation.]' [Citations.] ' "Finally, we determine whether the instruction, so understood, states the applicable law correctly." ' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.)

### 4. Analysis

Our analysis focuses on two issues regarding section 10802: (1) whether the prosecution must prove that the accused tampered with more than one VIN while harboring the requisite mental states for each such act of tampering, and (2) whether the phrase "for the purpose of sale [or] transfer" extends to purposive conduct by a purchaser or transferee.

### a. Construction of Section 10802 and Sufficiency of Evidence

### 1. Legislative History

Section 10802 was added to the Vehicle Code as part of Senate Bill No. 73 (1993–1994 Reg. Sess.) (Senate Bill 73). That bill addressed a failure of existing law to "make it a specific crime to own, operate, or conduct a 'chop shop.' " (Legis. Counsel's Dig., Sen. Bill No. 73 (1993–1994 Reg. Sess.) Stats. 1993, ch. 386.)

As noted *ante*, section 10802 punishes "[a]ny person who knowingly alters, counterfeits, defaces, destroys, disguises, falsifies, forges, obliterates, or removes vehicle identification *numbers*, with the intent to misrepresent the identity or prevent the

16

identification of motor *vehicles* or motor vehicle *parts*, for the purpose of sale, transfer, import, or export" (italics added).[11]

Section 10802 includes one actus reus and multiple mentes reae. The actus reus proscribes VIN tampering, punishing a person who "alters, counterfeits, defaces, destroys, disguises, falsifies, forges, obliterates, or removes vehicle identification numbers."[12] (§ 10802.) The mentes reae require that the person commit the proscribed act (1) "knowingly," (2) "with the intent to misrepresent the identity or prevent the identification of motor vehicles or motor vehicle parts," and (3) "for the purpose of sale, transfer, import, or export." (*Ibid.*) The second and third components involve specific intent. (See *People v. Hering* (1999) 20 Cal.4th 440, 446; see also *People v. Diaz* (1989) 212 Cal.App.3d 745, 750–751.)

Senate Bill 73 added other provisions to the Vehicle Code along with section 10802. One such provision is section 10801, which makes it a crime to knowingly and intentionally own or operate a " 'chop shop.' " (Stats. 1993, ch. 386, § 3.) Senate Bill 73 defined a " 'chop shop' " as a premises "where any person has been engaged in altering, destroying, disassembling, dismantling, reassembling, or storing any motor vehicle or motor vehicle part known to be illegally obtained by theft, fraud, or conspiracy to defraud, in order to" either "[a]lter, counterfeit, deface, destroy, disguise, falsify, forge, obliterate, or remove the identity, including the vehicle identification number, of a motor vehicle or motor vehicle part, in order to misrepresent the identity of the motor vehicle or motor vehicle part, or to prevent the identification of the motor vehicle or motor vehicle

---

[11] The Legislature has amended section 10802 once since enacting Senate Bill 73, to alter the prescribed punishment. (See Stats. 2011, ch. 15, § 604.) That amendment did not change the elements of section 10802.

[12] Senate Bill 73 defined " 'vehicle identification number' " as "the motor number, serial number, or other distinguishing number, letter, mark, character, or datum, or any combination thereof, required or employed by the manufacturer or the department for the purpose of uniquely identifying a motor vehicle or motor vehicle part or for the purpose of registration." (§ 671, subd. (a); Stats. 1993, ch. 386, § 2.)

part" or "[s]ell or dispose of the motor vehicle or motor vehicle part." (§ 250; Stats. 1993, ch. 386, § 1.)

Additionally, Senate Bill 73 included a provision prohibiting the purchase with intent to resell, the disposal, sale, or transfer, and the possession "for the purpose of sale, transfer, import, or export" of more than one motor vehicle or the parts from more than one motor vehicle with knowledge that "the vehicle identification numbers of the motor vehicles or motor vehicle parts" had been tampered with to misrepresent their identity or prevent identification. (§ 10803; Stats. 1993, ch. 386, § 3; see also § 10804 [exempting from liability under section 10803 "a motor vehicle scrap processor" and certain other persons, under specified circumstances].)

At the time the Legislature passed Senate Bill 73, existing law made it "a misdemeanor to intentionally deface, destroy, or alter the motor number, or other distinguishing number, or identification mark used for the registration of a motor vehicle, or to knowingly buy, sell, offer for sale, receive, or possess a vehicle or part from which any serial or identification number has been removed, defaced, altered, or destroyed." (Legis. Counsel's Dig., Sen. Bill No. 73 (1993-1994 Reg. Sess.) Stats. 1993, ch. 386; see §§ 10750, subd. (a), 10751, subd. (a);[13] see also § 10752 [prohibiting possession or sale of an identification number "with intent to prejudice, damage, injure, or defraud"].)

_____

[13] Section 10750, subdivision (a) provides: "No person shall intentionally deface, destroy, or alter the motor number, other distinguishing number, or identification mark of a vehicle required or employed for registration purposes without written authorization from the department, nor shall any person place or stamp any serial, motor, or other number or mark upon a vehicle, except one assigned thereto by the department."

Section 10751, subdivision (a) provides: "No person shall knowingly buy, sell, offer for sale, receive, or have in his or her possession, any vehicle, or component part thereof, from which any serial or identification number, including, but not limited to, any number used for registration purposes, that is affixed by the manufacturer to the vehicle or component part, in whatever manner deemed proper by the manufacturer, has been removed, defaced, altered, or destroyed, unless the vehicle or component part has attached thereto an identification number assigned or approved by the department in lieu of the manufacturer's number."

Senate Bill 73's author, Senator Hayden, described the purpose of his bill as follows:  "It is my intent, in proposing this bill, to create a specific crime of commercial auto theft to target those criminals who traffic in stolen vehicles and vehicle parts.  I believe that present law fails to adequately differentiate between those persons who steal a car for joy riding or to get a particular vehicle part and those who have established sophisticated 'chop shops' that steal, dismantle and export thousands of cars from California each year."  (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 73 (1993-1994 Reg. Sess.) May 25, 1993, p. 2.)

Bill analyses produced by the California State Senate for Senate Bill 73 described section 10802 using plural language for the words "numbers," "vehicles," and "parts." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 73 (1993-1994 Reg. Sess.) Feb. 16, 1993, p. 2 ["if any person knowingly alters, destroys, or removes vehicle identification numbers (VIN), with the intent to prevent the identification of motor vehicles or parts, for the purpose of sale, transfer, import, or export"]; Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 73 (1993–1994 Reg. Sess.) Apr. 12, 1993, p. 1 [same].)

By contrast, bill analyses produced by the California State Assembly described section 10802 using singular language.  (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 73 (1993–1994 Reg. Sess.) May 25, 1993, at p. 2 ["if any person knowingly alters, destroys, or removes *a VIN*, with a specified intent and purpose" (italics added)]; see also Assem. Com. on Ways and Means, Analysis of Sen. Bill No. 73 (1993–1994 Reg. Sess.) June 30, 1993, p. 1 ["knowingly alter, destroy or remove *a vehicle identification number*" (italics added)].)

2.  Whether Section 10802 Criminalizes Tampering with a Single VIN

With this background and context for section 10802 in mind, we turn to the questions at issue in this appeal.  We begin with whether the statute requires that the articulated actus reus and mentes reae apply to multiple VIN's and motor vehicles or

motor vehicle parts.[14]  The parties have not identified any appellate decisions addressing this question.  The Vehicle Code provides the general rule of construction that "[t]he singular number includes the plural, and the plural the singular." (§ 14.)  Our Supreme Court has described an identical rule appearing in Penal Code section 7 as "no mere rubric—it is the law." (*People v. Jones* (1988) 46 Cal.3d 585, 593.)  Further, section 6 provides:  "Unless the provision or the context otherwise requires, these general provisions and rules of construction shall govern the construction of this code."

Under these prescribed rules of construction, and guided by general principles of statutory interpretation, we must examine section 10802 and its context to determine whether the Legislature's use of plural words in section 10802 was intended to override the general rule and thus preclude any reading that uses the singular.  (See *Neary v. Town of Los Altos Hills* (1959) 172 Cal.App.2d 721, 728.)

Although section 10802 consistently uses plural language to state its elements, nothing in the language itself evinces an intent to override the general rule.  The statute makes sense grammatically when read in the singular or plural.  (See *Joiner*, *supra*, 84 Cal.App.4th at pp. 966, 968 [describing section 10802 variously, using both plural and singular language].)  Moreover, applying the statute to a circumstance of singular VIN tampering does not produce an absurd result or contravene the overall objective of Senate Bill 73, particularly when section 10802 is considered in the context of the entire bill.

Section 10801 (the "chop shop"-specific provision of Senate Bill 73) provides contextual support for applying section 10802 to singular VIN tampering.  When defining a " 'chop shop,' " the Legislature used the singular terms "vehicle identification number"

---

[14] Consistent with the common principles of criminal liability (see Pen. Code, § 20 ["In every crime . . . there must exist a union, or joint operation of act and intent, or criminal negligence."]), we understand the statute to require a congruence between the actus reus and the mens rea components with respect to the motor vehicle or motor vehicle part whose VIN has been tampered with.  In other words, even if (as here) two VIN's are knowingly tampered with, the second and third mens rea components apply to each act of VIN tampering.

and "motor vehicle or motor vehicle part." (§ 250.[15]) The Legislature thus evinced an intent to criminalize acts related to a single motor vehicle or part. This definition calls into question Killian's contention that the context surrounding section 10802 requires its plural words to be construed strictly to apply only when more than one VIN and associated vehicle or part is at issue.

Furthermore, as noted by the Attorney General, section 10803 includes express language requiring proof concerning multiple motor vehicles or motor vehicle parts. Section 10803 criminalizes conduct related to "more than one motor vehicle or parts from more than one motor vehicle." (See § 10803.) That the Legislature used such explicitly plural language in section 10803—which does not appear in section 10802—further supports a conclusion that the Legislature intended the general rule of construction stated in section 14 to apply to the simple plural words stated in section 10802.

We decide that notwithstanding the plural language stated in section 10802, that section may be violated by tampering with a single VIN. In such cases, section 10802 requires the prosecution to prove a defendant tampered with a single VIN and did so intending to misrepresent the identity or prevent the identification of the motor vehicle or motor vehicle part to which the tampered with VIN is associated and for the purpose of sale, transfer, import, or export of such a motor vehicle or motor vehicle part. (See *Joiner*, *supra*, 84 Cal.App.4th at p. 968.)

---

[15] Senate Bill 73 defined a " 'chop shop' " as a premises "where any person has been engaged in altering, destroying, disassembling, dismantling, reassembling, or storing any motor vehicle or motor vehicle part known to be illegally obtained by theft, fraud, or conspiracy to defraud, in order to do either of the following: [¶] (a) Alter, counterfeit, deface, destroy, disguise, falsify, forge, obliterate, or remove the identity, including the vehicle identification number, of a motor vehicle or motor vehicle part, in order to misrepresent the identity of the motor vehicle or motor vehicle part, or to prevent the identification of the motor vehicle or motor vehicle part. [¶] (b) Sell or dispose of the motor vehicle or motor vehicle part." (§ 250; Stats. 1993, ch. 386, § 1.)

21

### 3. Whether Section 10802 Includes Purposive Conduct by the Buyer or Transferee

Having construed section 10802 as applying to a single VIN and its associated motor vehicle or motor vehicle part, we turn to the statutory requirement that the VIN tampering be committed "for the purpose of sale [or] transfer."[16] (§ 10802.) In particular, we examine whether the statute is limited to a purpose to sell or transfer the vehicle or can also extend to purposive conduct by a buyer or transferee.

While the parties do not point us to case law directly addressing the meaning of the phrase "for the purpose of sale [or] transfer" in section 10802 or any Vehicle Code definitions for this language, the code does include related concepts. The Vehicle Code defines a " 'retail sale' " as "a sale of goods to a person for the purpose of consumption and use, and not for resale to others, including, but not limited to, an arrangement where a motor vehicle is consigned to a dealer for sale." (§ 520.)

The Vehicle Code addresses transfer of title or any interest in or to a registered vehicle. Section 5600, subdivision (a) provides that "[n]o transfer of the title or any interest in or to a vehicle registered under this code shall pass, and any attempted transfer shall not be effective, until the parties thereto have fulfilled" certain specified requirements. In the same vein, section 5900 addresses "sale or transfer" and provides, inter alia, that "[w]henever the owner of a vehicle registered under this code sells or transfers his or her title or interest in, and delivers the possession of, the vehicle to another, the owner shall, within five calendar days, notify the department of the sale or transfer." (§ 5900, subd. (a).) Further, section 640 defines a " 'transferee' " as "a person

---

[16] There is no dispute here concerning the two other mens rea components of section 10802. Killian does not contest that the evidence proved he knowingly tampered with the VIN on the stolen truck and did so with the intention to misrepresent the identity or prevent the identification of that truck. Further, as described *ante*, the statutory language referencing import or export does not apply on these facts.

22

who has acquired the sole ownership of or an equity in a vehicle of a type required to be registered under this code."

Because the words "for the purpose of sale [or] transfer" are not specifically defined in the Vehicle Code, we look to dictionary definitions for their usual and ordinary meaning. (See *In re N.R.* (2023) 15 Cal.5th 520, 539; *De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 590–591.)

A "purpose" is "[a]n objective, goal, or end." (Black's Law Dict. (11th ed. 2019) p. 1493, col. 1; see Webster's Third New Internat. Dict. (1993) p. 1847, col. 1 ["something that one sets before himself as an object to be attained: an end or aim to be kept in view in any plan, measure, exertion, or operation"].)

The noun "sale" means "the act of selling : a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price (as a sum of money or any other consideration)." (Webster's Third New Internat. Dict. (1993) p. 2003, col. 1; see Black's Law Dict. (11th ed. 2019) p. 1603, col. 2 ["sale" means "[t]he transfer of property or title for a price"]; see also Webster's Third New Internat. Dict. (1993) p. 2061, col. 3 [the verb "sell" means "to give up (property) to another for money or other valuable consideration"].)

The noun "transfer" is defined, inter alia, as: "1a: the conveyance of right, title, or interest in either real or personal property from one person to another by sale, gift, or other process b: the removal or acquisition of property by mere delivery with intent of the parties involved to transfer the title . . . 2: an act, process, or instance of transferring: transference." (Webster's Third New Internat. Dict. (1993) p. 2427, col. 1, boldface, capitalization, & spaces omitted; see Black's Law Dict. (11th ed. 2019) p. 1803, col. 1 ["1. Any mode of disposing of or parting with an asset or an interest in an asset . . . . 2.

23

Negotiation of an instrument according to the forms of law. 3. A conveyance of property or title from one person to another."].[17])

Similarly, the Civil Code provides that "[t]ransfer is an act of the parties, or of the law, by which the title to property is conveyed from one living person to another." (Civ. Code, § 1039.)

Our Supreme Court has stated that "while the word 'transfer' as used in the Civil Code indicates the passing of title from one person to another, in its ordinary use it has a very general meaning, including the removal of a thing from one place or person to another, the changing of its control or possession or the conveyance of title to it. It is also true that a 'transfer' of property may be effected by delivery of its possession to another." (*Commercial Discount Co. v. Cowen* (1941) 18 Cal.2d 610, 614; see also *People v. Wimer* (2022) 74 Cal.App.5th 113, 137 [" 'Transfer,' a term not defined in [Penal Code section 311], means '[t]o convey or remove from one place or one person to another.' "], citing Black's Law Dict. (11th ed. 2019) p. 1803, col. 2; Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 1328.)

Killian asserts "[i]t is axiomatic that a person cannot sell a vehicle to himself." He further asserts that "to violate section 10802, a person must have the purpose, when wrongfully altering or modifying a VIN number, of selling, transferring, importing or exporting the vehicle so modified to another person."[18]

_____

[17] The verb form of "transfer" is defined, inter alia, as "1a: to carry or take from one person or place to another: transport, remove . . . b: to move or send to a different location esp. for business, vocational, or military purposes . . . c: to cause to pass from one person or thing to another: transmit . . . d: to cause to transform: change . . . 2: to make over or negotiate the possession or control of (a right, title, or property) by a legal process usu[ally] for consideration: convey." (Webster's Third New Internat. Dict. (1993) pp. 2426–2427, col. 3, boldface, capitalization, & spaces omitted.)

[18] Because the jury was not instructed on "import" and "export," we do not address Killian's argument that section 10802 cannot be satisfied by a purpose of import or export to oneself.

24

Killian and the Attorney General seemingly agree that the purposive transfer under section 10802 must involve a conveyance of the motor vehicle or motor vehicle part from one person to another.[19]  However, the parties dispute whether the purposive transfer from one person to another is limited to that of the transferor.

In *Joiner*, the Court of Appeal addressed whether there was sufficient evidence to support convictions under section 10802.  (See *Joiner*, *supra*, 84 Cal.App.4th at pp. 964–971.)  One of the defendants in *Joiner*, Robin Beames (Robin), was a licensed "vehicle verifier," i.e., a person who inspects VIN's and completes documents attesting to their correctness.  (*Id*. at pp. 954–955, 969–970; see § 675.5.)  On appeal, Robin argued "there was no evidence presented that she personally ever switched a VIN plate from one vehicle to another." (*Joiner*, at p. 969.)  The Attorney General countered that there was evidence showing that "Robin was responsible for verifying vehicles with obviously tampered VIN plates" and "this activity constitutes falsifying vehicle identification numbers with the intent to misrepresent the identity of the vehicles."  (*Ibid*.)

The *Joiner* court concluded that Robin was properly convicted of three counts under section 10802 based on her acts of falsely verifying the VIN's of three vehicles in Department of Motor Vehicles (DMV) documents "to facilitate documentary transfer and registration" of those vehicles.  (*Joiner*, *supra*, 84 Cal.App.4th at p. 971.)  The evidence showed "as to each of the vehicles involved, that the VIN plates all appeared to have been tampered with" (*id*. at pp. 970–971) and other VIN's on the vehicles were missing and/or non-matching.  (*Id*. at p. 971; see *id*. at pp. 957–961.)

The *Joiner* court explained its conclusion regarding the sufficiency of the evidence as follows:  "[T]he jury could reasonably infer that when Robin verified the vehicles, she

_____

[19] Neither party argues that the "transfer" purpose includes an objective to move the motor vehicle or part from one place to another.  We thus do not consider whether a purpose to physically move a motor vehicle or part associated with the tampered VIN would satisfy section 10802's mens rea component.

25

was aware [that another defendant,] Joiner had tampered with the VIN plates. In addition, the jury could reasonably infer that she knowingly falsified her verification of the VINs with the intent to misrepresent them to the DMV so the vehicles could be transferred and registered as documented by her verification. In other words, Joiner switched the VIN plates to disguise the true identity of the vehicles for later transfer, and Robin falsified the documents pertaining to the disguised vehicles to facilitate the documentary transfer and registration. This was all done for the purpose of misrepresenting and hiding the true identity of the vehicles." (*Joiner*, *supra*, 84 Cal.App.4th at p. 971.)

Considering the language of section 10802—including the plain meaning of the words "purpose," "sale," and "transfer"—and the reasoning of the court in *Joiner*, we decide that the phrase "for the purpose of sale [or] transfer" includes a defendant who harbored an objective to facilitate a conveyance of the motor vehicle or motor vehicle part itself or an interest thereto (whether or not accompanied by consideration) when tampering with a VIN. Put differently, the purposive sale or transfer required by section 10802 encompasses a defendant who harbored a goal to enable such a conveyance, regardless of whether the defendant intended to act as a seller, buyer, transferor, or transferee in the conveyance. As long as the fact finder concludes beyond a reasonable doubt that *when* the defendant committed the act of VIN tampering he or she intended to prevent the identification of the motor vehicle (or vehicle part) and did so for the purpose of facilitating a conveyance of the motor vehicle or motor vehicle part, the defendant can be convicted of the crime. The defendant's precise role in the conveyance as buyer, seller, transferor, or transferee is not determinative.

This construction of section 10802's purposive language accords with section 10803, subdivision (b)'s use of identical language. Section 10803, subdivision (b) criminalizes possession of multiple motor vehicles or motor vehicle parts with certain mental states, including "purpose of sale, transfer, import, or export." The subdivision

26

states in relevant part: "Any person who possesses, for the purpose of sale, transfer, import, or export, more than one motor vehicle or parts from more than one motor vehicle, with the knowledge that the vehicle identification numbers of the motor vehicles or motor vehicle parts have been altered, counterfeited, defaced, destroyed, disguised, falsified, forged, obliterated, or removed for the purpose of misrepresenting the identity or preventing the identification of the motor vehicles or motor vehicle parts, is guilty of a public offense." (*Ibid.*)

Under section 10803, subdivision (b), the purposive conduct mental state must coincide with possession of multiple motor vehicles or parts. Section 10803, subdivision (b) thus criminalizes possession of the vehicle or part with the tampered VIN, whereas section 10802 targets the person who engages in the VIN tampering. There is no incongruity between section 10802's prohibition on tampering with a VIN while harboring an objective to facilitate a conveyance of the motor vehicle or part and section 10803, subdivision (b)'s prohibition on possessing multiple motor vehicles or parts knowing that the VINs have been tampered with while harboring that same objective.

Furthermore, our construction of section 10802 does not render it or section 10803 duplicative of or otherwise incompatible with the misdemeanor offenses that prohibit VIN alteration without DMV authorization (§ 10750, subd. (b)) or knowingly buying, selling, offering for sale, receiving, or possessing any vehicle or part from which a VIN "has been removed, defaced, altered, or destroyed" (unless authorized by DMV). (§ 10751, subd. (a).) Section 10750 does not include the requirement that the VIN alteration be done for the purpose of transfer or sale; section 10751 does not require that the buyer or seller alter the VIN to be convicted of the offense.

Having decided that section 10802 applies to tampering with a single VIN and associated motor vehicle and can extend to the transferee in a conveyance as long as they have the required purpose and intent, it is clear that substantial evidence supports Killian's conviction of count 3. The evidence here permitted the jurors to reasonably

27

deduce that Killian disguised the VIN on the stolen truck while harboring the goal of facilitating the conveyance of an interest in that truck from Michael B. and/or Chris Marker to himself. That this purposive sale or transfer involved Killian as a buyer or transferee does not defeat criminal liability under section 10802.

Furthermore, the evidence supports the jury's implicit finding that Killian did the act of VIN tampering for the purpose of facilitating the transfer of the vehicle from Michael B. and/or Chris Marker to himself. In particular, the short period between the original theft of the vehicle and Killian's purchase of it from Marker supports the jury's conclusion that he committed the act of tampering for the purpose of transferring it to himself. (Cf. *Joiner*, *supra*, 84 Cal.App.4th at p. 968 ["The actual sale, transfer, import or export need not be completed as long as the VIN is changed for one of those purposes."].) Based on the evidence presented and given Killian's failure to challenge the other requisite elements of section 10802, we conclude that there is sufficient evidence for a reasonable juror to find Killian guilty, beyond a reasonable doubt, on count 3.

### b. Jury Instructions on Section 10802

In the alternative to his claim of insufficient evidence, Killian asserts instructional error.

As detailed *ante* (pt. II.A.1.), the trial court instructed the jury with language (agreed to by the parties) that essentially mirrored the language of section 10802. In addition, the court responded to a jury question (i.e., "Under Vehicle Code [section] 10802 (VIN alteration) does transfer include transfer of ownership of the vehicle to himself?") by directing the jury back to its final instructions. (See pt. II.A.1., *ante*.) Although Killian's defense counsel objected to a proposed " 'yes' " answer to the jury's question, counsel said the defense was satisfied with the response ultimately provided.

Killian contends that if we agree with his proposed construction of section 10802 that he must have had the purpose of selling or transferring the stolen vehicle to another

28

person but conclude that there was sufficient evidence of a purposive sale or transfer of the stolen vehicle to another person, his conviction "must be reversed based on the combined effect of the court's misinstruction on this element and its failure to respond correctly to the jury's question during deliberations." He claims that he was deprived of his right to jury findings as to all elements under section 10802 because the trial court "failed to explain that the 'purpose of sale or transfer' required a 'transfer' be to another person, and not to the defendant himself."

The Attorney General counters that Killian forfeited his instructional error claim because his defense counsel helped to craft the final jury instruction, did not object to the instruction, and did not request a definition of transfer. The Attorney General similarly asserts that Killian forfeited his claim regarding the trial court's answer to the jury's question during deliberation because defense counsel agreed to the trial court's answer, which directed the jurors to the instructions already given and told them to apply the ordinary, everyday meaning of words. Further, the Attorney General contends that the trial court fully and fairly instructed the jury on the elements of section 10802, and, regardless, any alleged instructional error was harmless.

Assuming without deciding that Killian's instructional error claim is not forfeited, we are not persuaded that the trial court erred when instructing the jury on count 3 or in answering the jury's question. "A court's duty to define statutory terms 'arises where the terms have a technical meaning that is peculiar to the law.' [Citation.] In contrast, '[w]hen a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " ' " (*People v. Krebs* (2019) 8 Cal.5th 265, 331–332.)

Purpose, sale, and transfer are commonly understood terms. The trial court used the words as they appear in the statute when instructing the jury and did so with Killian's consent. The instruction completely and correctly stated all the elements of the offense.

29

Furthermore, we discern no abuse of discretion in the trial court's response to the jury's question whether "transfer include[s] transfer of ownership of the vehicle to himself." The jury's question is not completely clear because it does not articulate who the jury had in mind as the transferor (i.e., whether it was Marker or perhaps Killian). Given this lack of clarity and the defense's stated satisfaction with the court's answer, we cannot conclude that the court abused its discretion by referring the jurors back to the final instructions and telling them that undefined words should be given "their ordinary, everyday meanings." Under the ordinary meaning of the words in the instruction regarding the purposive conduct element, there is a reasonable likelihood the jurors understood the court's final instruction in accord with the construction stated above (see pt. II.A.4.a.3., *ante*), including that the purposive sale or transfer involve a conveyance from one person to another person.

Moreover, even assuming arguendo the trial court erred in answering the jury's question, we cannot conclude, under *Watson*, that Killian " 'has demonstrated that it is " 'reasonably probable that a result more favorable to [him] would have been reached in the absence of the error.' " ' " (*Fleming*, *supra*, 27 Cal.App.5th at p. 768.) As discussed *ante*, the evidence supported that Killian had in mind the goal of enabling the conveyance of the stolen truck from another to himself when he knowingly tampered with the truck's VIN with the intent to misrepresent the identity or prevent the identification of that truck.

For these reasons, we reject Killian's alternative claim of instructional error.

B.  *Penal Code Section 654*

Killian contends the trial court erred in imposing a consecutive sentence for his conviction on count 3 and instead should have stayed the punishment under Penal Code section 654. He asserts that in this case "there was one criminal purpose: for [him] to establish a colorable claim to continued possession of the stolen truck, with the knowing possession of [the] stolen vehicle and the VIN alteration two steps toward this larcenous goal." He further asserts that "[t]he two acts here – purchasing a stolen vehicle, then

attempting to transplant the VIN number from another vehicle – were part of a single scheme to make the stolen car [his] own car." The Attorney General counters that "[b]ecause [Killian] committed two different acts in furtherance of two different criminal purposes, [Penal Code] section 654 does not preclude multiple punishment[s]."

Penal Code section 654 "precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Assad* (2010) 189 Cal.App.4th 187, 200.) "[T]he purpose of [Penal Code] section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.)

Application of Penal Code section 654 "requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Only if the case involves more than one act does a court consider whether the case involves a course of conduct. (*Ibid.*) "At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act." (*Id.* at p. 312.) If the convictions involve more than one act, the court reaches "step two of the [Penal Code] section 654 analysis: whether the [course of conduct] involved multiple intents and objectives." (*Id.* at p. 316.) At step two, whether crimes arise from an indivisible course of conduct turns on the perpetrator's intent and objective. (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled in part on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 341.)

Whether a defendant harbored a single intent—and thus a single objective—is a factual question; the applicability of Penal Code section 654 to settled facts is a question of law. (*Harrison*, *supra*, 48 Cal.3d at p. 335.) An appellate court will sustain a trial

court's implied factual determination in the application of Penal Code section 654 if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730–731; see also *People v. Venegas* (2020) 44 Cal.App.5th 32, 38.)

There is no dispute that Killian's convictions on counts 2 and 3 involve more than one act. Thus, the question under Penal Code section 654 is whether Killian's course of conduct involved multiple intents and objectives.

We conclude that substantial evidence supports the trial court's implicit determination that Killian harbored multiple intents and objectives. The prosecution proved that Killian bought and took possession of Michael B.'s truck from Marker knowing that it had been stolen. (See Pen. Code, § 496d, subd. (a).) Killian's own testimony supports that his intent and objective was to obtain a working truck so that he could move from Greene's property to Kentucky. Regarding the VIN tampering, Killian admitted that he placed the VIN from his broken-down truck onto the stolen truck because he "was trying to save money on registration" and hide its identity. Killian's intent and objective for the VIN tampering was not incident to buying and receiving the stolen truck. Rather, he tampered with the VIN for additional, distinct reasons, and his buying and possessing a stolen vehicle were not a preliminary step to tampering with its VIN. There was no need for him to tamper with the VIN to possess and control the stolen truck as if he owned it.

We are not persuaded by Killian's reliance on *People v. Kenefick* (2009) 170 Cal.App.4th 114 and *Burris v. Superior Court* (1974) 43 Cal.App.3d 530. Those cases are materially distinguishable from the present case because the various acts in those cases all related to a single objective to unlawfully obtain money. (See *Kenefick*, at pp. 124–125; *Burris*, at pp. 535–536.) Here, Killian's acts involve more than one objective.

32

Based on the evidence in this case, we conclude that the trial court properly imposed unstayed sentences on counts 2 and 3 because Penal Code section 654 does not apply to those counts.

C. *Prior Strike Conviction*

In his opening brief Killian contends that there was insufficient evidence to prove he had suffered a prior strike conviction for assault with a deadly weapon under Penal Code section 245, former subdivision (a)(1).

The Attorney General responds that Killian misreads the record regarding the prior strike conviction allegation, in that the trial court did not find true a prior strike conviction for assault with a deadly weapon. Rather, the trial court only found true a prior strike conviction based on Killian's prior conviction for assault with a firearm under Penal Code section 245, subdivision (a)(2).

In his reply brief, Killian acknowledges that the trial court made its finding regarding the truth of the information's sole prior strike conviction allegation based only on his prior conviction for the assault with a firearm. Nevertheless, Killian asks us to "direct the trial court to enter a 'not true' finding" as to the assault with a deadly weapon conviction that was included in the prior strike conviction allegation and "direct the trial court to amend the minutes and abstract of judgment to reflect that only one of the two charged strike priors was found true, and that the other alleged strike prior was found not true." Additionally, Killian requests that we "remand[] for resentencing so that the court can properly exercise [Penal Code] section 1385 discretion based on the true finding of a *single* strike, and not two strikes."

We agree with Killian that, for clarity, the clerk's minute order, dated July 15, 2022, should be amended to reflect that the trial court's finding as to the truth of the prior strike conviction allegation rested solely on Killian's prior strike conviction for assault with a firearm (Pen. Code, § 245, subd. (a)(2)). We will direct the clerk of the trial court to do so. Given that impending clarification, we discern no need to further direct the trial

33

court to enter a separate not true finding as to the assault with a deadly weapon or by means of force likely to produce great bodily injury conviction (Pen. Code, § 245, former subd. (a)(1)), which also is mentioned in the information's unitary prior strike conviction allegation.

As for Killian's request regarding the abstract of judgment, because that document includes only a checkbox to indicate the trial court's true finding for the "strike prior" under Penal Code section 1170.12, and the amended minute order will now specify which of the alleged assaults was found true under the prior strike conviction allegation, there is no need to direct the clerk of the trial court to amend the abstract of judgment.

In addition, we will not remand this matter for resentencing because there is no indication in the record that the trial court was ignorant of its prior ruling regarding the truth of the prior strike conviction allegation when it ruled on Killian's motion to strike the prior strike. In fact, Killian's motion reiterated that the court had "found [him] to have suffered a prior strike conviction from March 7, 1996 for a violation of Penal Code Section 245[, subdivision] (a)(2)." Furthermore, when arguing the motion at Killian's sentencing hearing, defense counsel twice mentioned the prior conviction as one having been suffered under Penal Code section 245, subdivision (a)(2). Under these circumstances, there is no reason for remand and resentencing.

D. *Senate Bill 81*

Effective January 1, 2022, Senate Bill 81 amended Penal Code section 1385, subdivision (c) (hereafter, Penal Code section 1385(c)), to give trial courts more discretion to strike sentence enhancements under certain circumstances.[20] (See *People v. Burke* (2023) 89 Cal.App.5th 237, 242 (*Burke*).)

_____

[20] The Legislature has amended Penal Code section 1385(c) twice since enacting Senate Bill 81, but the more recent changes to Penal Code section 1385(c) do not affect our analysis of Killian's claim. (See Stats. 2022, ch. 58, § 15; Stats. 2023, ch. 131, § 160.)

34

Killian contends Penal Code section 1385(c), as amended by Senate Bill 81, applies to strike priors under the Three Strikes law. He further asserts the *Burke* court's conclusion that amended Penal Code section 1385(c) does not apply to strike priors is wrong and should not be followed, and this case should be remanded for a new sentencing hearing at which Penal Code section 1385(c) can be applied. Killian acknowledges that his defense counsel failed to raise this issue in the trial court. Nonetheless, he asserts that we should consider his claim of error because it presents a purely legal issue or, alternatively, defense counsel provided constitutionally ineffective assistance of counsel.

The Attorney General responds that Killian's claim lacks merit because Senate Bill 81 does not apply to strike priors because the Three Strikes law involves an alternative sentencing scheme rather than a sentence enhancement. In addition, the Attorney General contends that forfeiture is "obvious" here and, even assuming deficient performance by defense counsel, Killian has not demonstrated prejudice for his claim of ineffective assistance of counsel.

Assuming arguendo that forfeiture does not apply in this circumstance, we will address the merits of Killian's claim.[21]

Penal Code section 1385, subdivision (a), authorizes trial courts to dismiss an action "in furtherance of justice." (Pen. Code, § 1385, subd. (a).) In *Romero*, the California Supreme Court held that a trial court's discretion under Penal Code section 1385, subdivision (a) includes the power to dismiss a prior conviction alleged under the Three Strikes law. (*Romero*, *supra*, 13 Cal.4th at pp. 529–530; see *People v. Williams* (1998) 17 Cal.4th 148, 158 [a court may "strike or vacate an allegation or finding under

---

[21] Because we consider Killian's claim on the merits, we need not address his alternative claim of ineffective assistance of counsel.

35

the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony"].)

Penal Code section 1385, subdivision (b), pertains to enhancements. It states, "If the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice in compliance with subdivision (a)." (Pen. Code, § 1385, subd. (b)(1).)

Senate Bill 81 amended section 1385 to add subdivision (c), which "expressly applies to the dismissal of an 'enhancement.' " (*Burke*, *supra*, 89 Cal.App.5th at p. 243; Stats. 2021, ch. 721, § 1.) The new subdivision lists specific mitigating factors a court must consider when deciding whether to strike an enhancement from a defendant's sentence in the interest of justice. (Pen. Code, § 1385(c); *Burke*, at pp. 242–243.)

We review de novo, as a matter of statutory interpretation, whether the amendments to section 1385 enacted by Senate Bill 81 apply to prior strike convictions. (*Burke*, *supra*, 89 Cal.App.5th at p. 242.)

In *Burke*, the Third District Court of Appeal looked to the statutory language as the primary indication of legislative intent, noting Penal Code section 1385's express application to "an 'enhancement.' (§ 1385, subd. (c)(1).)" (*Burke*, *supra*, 89 Cal.App.5th at p. 243.) The court considered both the "well-established technical meaning [of 'enhancement'] in California law" (*ibid*.) and case authority concluding that the Three Strikes law is not an enhancement but "an alternative sentencing scheme for the current offense" (*ibid*.). The court reasoned that since words in a statute " 'are presumed to be used in accordance with their established legal or technical meaning' " (*ibid*.), and it is "well established that the Three Strikes law is not an enhancement" (*ibid*.), Penal Code section 1385(c) does not apply to the Three Strikes law. (*Id*. at p. 244.)

There is no split of authority on this issue among the California Courts of Appeal post *Burke*. The First District Court of Appeal, Division Five recently examined

36

additional arguments—based on Penal Code section 1385, subdivision (c)(2)(G)—that were not addressed by the *Burke* court.  (*People v. Olay* (2023) 98 Cal.App.5th 60, 66–69.)  The *Olay* court "still agree[d] with *Burke*'s ultimate conclusion—that [Penal Code] section 1385, subdivision (c) does not apply to the Three Strikes law."  (*Id.* at p. 67.)

We agree with the holdings in *Burke* and *Olay* that Penal Code section 1385, subdivision (c)'s provisions regarding enhancements do not apply to the Three Strikes law.  (*Burke*, *supra*, 89 Cal.App.5th at p. 244; *Olay*, *supra*, 98 Cal.App.5th at p. 69; accord *People v. Tilley* (2023) 92 Cal.App.5th 772, 776, fn. 2.)

We are not persuaded by Killian's contrary interpretation of the statute and, thus, do not agree that this case must be remanded for a new sentencing hearing under Penal Code section 1385(c).

### III.  DISPOSITION

The judgments in docket Nos. 22CR003439 and 22CR006162 are affirmed.  The victim restitution order, dated November 10, 2022 (docket No. 22CR003439), is affirmed.

The clerk of the Monterey County Superior Court is directed to amend the minute order, dated July 15, 2022 (docket No. 22CR003439), to indicate that the trial court found the prior strike conviction allegation (Pen. Code, § 1170.12, subd. (c)(1)) true based only on defendant's prior conviction on March 7, 1996, for a violation of Penal Code section 245, subdivision (a)(2) (Monterey County Superior Court docket No. SC951263).

_____

                                                        Danner, J.



WE CONCUR:




_____

Bamattre-Manoukian, Acting P. J.




_____

Bromberg, J.




**H050320, H050557**
*People v. Killian*

Filed 3/5/2024

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROSS RICHARD KILLIAN,<br><br>    Defendant and Appellant. | H050320, H050557<br>(Monterey County<br> Super. Ct. No. 22CR003439,<br> 22CR006162) |

BY THE COURT:

The opinion in this case filed February 20, 2024, was not certified for publication. After the court's review of a request under California Rules of Court, rule 8.1120(a), and it appearing that the opinion meets the standards for publication under California Rules of Court, rules 8.1105 and 8.1110, it is therefore ordered that the opinion be published in the Official Reports with the exception of parts II.B, II.C, and II.D.

_____
Danner, J.


_____
Bamattre-Manoukian, Acting P. J.


_____
Bromberg, J.


**H050320, H050557**
*People v. Killian*

Trial Court:    Monterey County Superior Court

Trial Judge:    Hon. Mark E. Hood

Counsel:    William M. Robinson, First District Appellate Project, for Defendant
            and Appellant.

            Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney
            General, Jeffrey M. Laurence, Senior Assistant Attorney General,
            Alice B. Lustre, Supervising Deputy Attorney General and Sarah J.
            Farhat, Deputy Attorney General, for Plaintiff and Respondent.

**H050320, H050557**
*People v. Killian*